GRAY COMPANY, INC.,

*vs.*

ALEMITE CORPORATION.

*New Castle, July* 13, 1934.

*Hugh M. Morris* and *Ivan Culbertson,* and *Leonard L. Kalish,* of Philadelphia, Pa., for complainant.

*Caleb S. Layton,* of the firm of Richards, Layton & Finger, *Lynn A. Williams* and *Casper W. Ooms,* of the firm of Williams, Bradbury, McCaleb & Hinkle, both of Chicago, Ill., and *Ralph M. Shaw,* of the firm of Winston, Strawn & Shaw, of Chicago, Ill., for defendant.

THE CHANCELLOR: This suit is concerned with a controversy arising out of certain agreements between the complainant (herein referred to as Gray) and the defendant (herein referred to as Alemite) touching license rights under patents to manufacture and sell lubricating equipment. The bill also sets up a ground of complaint against the defendant of unfair competition in trade and trade libel and slander in violation of the agreements above mentioned.

Prior to 1932 Gray and Alemite were engaged in competition as manufacturers and vendors of lubricating equipment under patents and applications for patents respectively owned or controlled by them. The nature of the equipment is described in the bill. It is not necessary for the purpose of this case to describe it. Numerous patents have been issued and applications for patents made, covering types and features of the sort of lubricating equipment the parties here are engaged in manufacturing and marketing. These patents and applications appear to be owned

principally by three corporations. They are the complainant, the defendant, and Lubrication Corporation, a corporation of Delaware (hereinafter referred to as Lubrication). The patents and applications owned by Lubrication are over ninety in number and may be grouped under the general name of "Standix" patents.

Prior to 1932 Alemite sued Gray for infringement of patents in the District Court of the United States for the District of Minnesota, Fourth Division. After the case was heard but before decision, Alemite and Gray settled their differences. The settlement not only composed past differences and the then pending suit, but embodied an arrangement for the future whereby Gray became the licensee of Alemite to manufacture and, sell equipment covered by the latter's patents.

The settlement was embodied in a written license agreement dated April 22, 1932. The terms of that agreement need not be set out in full. For the purposes of this case it is sufficient to say that by the agreement Alemite, subject to the conditions and limitations therein stated, granted to Gray

"The non-exclusive right and license under the aforesaid United States Letters Patent and under any other United States Letters Patent and patent applications *now or hereafter owned or controlled by Alemite, and under which Alemite now has or may hereafter acquire the right and authority to grant a non-exclusive license such as is hereinelsewhere granted* * * * to manufacture lubricant compressors, etc., * * * and to sell the said compressors, etc. * * * *"

It was further provided, *inter alia* as follows:

"Unless sooner terminated or cancelled by mutual consent, or in accordance with the provisions hereinabove expressly stated, *this License Agreement and the non-exclusive license herein granted shall continue in full force and effect until the expiration of the latest United States Patent under which a license is herein granted.*"

Gray was given the right at the time of making any

of the verified quarterly reports it agreed to make showing the volume of business done by it upon which the royalty of ten per cent. of Gray's net selling price was to be calculated and paid, to elect to terminate the agreement and the non-exclusive license therein granted, termination to be effective at the expiration of the then current quarterly accounting period of three months and upon payment at that time of all earned and accrued royalties.

Alemite was not allowed to terminate the agreement and non-exclusive license therein granted, except upon the happening of certain conditions or defaults wholly within Gray's control.

Thus Gray could elect to retire from the license agreement at any time, and Alemite had no such right of election.

The next agreement between Gray and Alemite was entered into on April 25, 1932. By that agreement Gray granted to Alemite a non-exclusive right and license to make, use and sell lubricating equipment embodying the inventions described in the United States Letters Patent owned by Gray. Alemite agreed to pay to Gray royalties specified in the agreement. Alemite agreed to pay and did pay $107,500 in cash to Gray which sum was agreed by the parties to be paid on account of royalties yet to be earned. No further cash on account of royalties was to be paid by Alemite until the royalties due from it exceeded in the aggregate the said sum. Gray agreed to pay to Alemite the sum of $20,000 in monthly installments of $833.33 upon the happening of the contingency now about to be explained.

The contract recited that Alemite was then in negotiation with Lubrication for certain license or other rights under Lubrication's so-called Standix patents "as a result of which said negotiation Alemite may subsequently be in a position to procure for or grant to Gray a more or less extensive license under the said Standix patents," and that Gray desired to secure the benefits of a non-exclusive

license under the Standix patents. This recital is the background for one of the terms of the contract which is as follows:

"Alemite agrees that when and if it shall become possible for Alemite so to do, it will exhibit and offer to deliver to Gray a non-exclusive agreement granting Gray the right to manufacture and sell the compressor parts of lubricating systems or equipments under the said Standix patents, and *under terms and conditions corresponding substantially or approximately, in so far as Alemite may be able to procure or extend them, with the terms and conditions of a certain license agreement * * * made and entered into between Alemite and Gray on the 22nd day of April,* 1932 * * * *and Gray agrees from and after Alemite's* exhibition and offer to deliver *such* a non-exclusive agreement under the said Standix patents, and between the 15th and 30th days of each month thereafter for a period of twenty-four months, to pay to Alemite the sum of Eight Hundred and Thirty-three Dollars and Thirty-three Cents ($833.33). * * *"
(The installments aggregate $20,000. This sum the parties agreed Gray should pay to Alemite as Gray's proportionate part of the cost to Alemite of securing the Standix license.)

Thereafter Alemite by agreement dated July 7, 1932, obtained from Lubrication, in consideration of the payment of $450,000.00, an "exclusive right and license to make or have made, to use and/or to sell throughout the United States, * * * and the right without payment of additional royalty to export freely between the United States and Canada and from either or both thereof to any and all other countries, lubricating equipment" embodying the inventions described in the patents now owned "or hereafter owned or acquired by Lubrication, and/or under which Lubrication may now or hereafter acquire the right so to license Alemite." This agreement further provided that Alemite should have the right at its election to extend to any or all of its present licensees a non-exclusive sublicense under the rights above mentioned as granted to it upon terms and conditions not inconsistent with those expressed in the agreement, terminable upon the termination of Alemite's rights as licensee under the agreement.

The agreement by its terms was to continue in force until March 11, 1947, with an option on Alemite's part to extend its life for any period which it might designate in a notice in writing delivered to Lubrication at least six months before March 11, 1947. Alemite, however, was given the right at its election to terminate the agreement upon one year's written notice, provided that in no event should such termination be effective prior to July 1, 1938.

The bill alleges that the defendant in disregard of its agreement of April 25, 1932, has failed within a reasonable time after July 7, 1932, when it acquired the right to issue sub-licenses under Lubrication's Standix patents, to exhibit and offer to deliver to the complainant a formal, written, non-exclusive license agreement granting the complainant rights to manufacture and sell under those patents; that notwithstanding the complainant has the right under the agreement of April 22, 1932, which conveyed rights under patents which the defendant might own or control in the future, to manufacture and sell under the Standix patents, yet the complainant desires the formal license agreement covering those patents and has offered to pay to the defendant the twenty thousand dollars therefor which the agreement of April 25, 1932, required should be paid by the complainant as consideration therefor.

The formal license agreement which the complainant insists it is entitled to is one that will extend throughout the life of the longest Standix patent now existing or hereafter obtained. If an agreement of that length is given, it means that Alemite must not only not exercise its right to terminate its agreement with Lubrication but must elect to continue the same for the indefinite future after March 11, 1947. The complainant complains by its bill that Alemite has failed this far in advance of 1947 to elect to continue its agreement with Lubrication for the duration of the longest life of existent or future Standix patents, and thus put itself in position to exhibit and offer to the complainant

a sub-license under those present and future patents having a duration of that extent; for, says the complainant, as the longest life of the present and future patents owned or controlled by Alemite is the duration of the license under the complainant's agreement with Alemite of April 22, 1932, and since Alemite as exclusive licensee, with a right to sub-license, under the Standix patents controls if it does not own them, Alemite is bound by its agreement of April 22, 1932, with the complainant to put itself in position to sub-license the complainant for the longest life of any existent or future Standix patent. Only by doing so, the bill in effect alleges, can Alemite grant license rights under the Standix patents "under terms and conditions corresponding substantially or approximately, in so far as Alemite may be able to procure or extend them, with the terms and conditions" of the license agreement of April 22, 1932, between the complainant and defendant. The bill alleges that Alemite threatens to terminate its agreement with Lubrication and to extend the same.

The last of Lubrication's existing Standix patents expires in 1947. It has pending twelve applications for patents. As the agreement between Lubrication and Alemite may be kept alive by Alemite's omission to cancel and by the exercise of its right to elect at any time not less than six months before March 11, 1947, to extend the agreement to such time as it may choose, it is apparent that Alemite has it in its power, if it desires, to retain the rights of an exclusive licensee, and the right to create non-exclusive sub-licenses, under the Standix patents so long as any of the present or future Standix patents may be alive. Inasmuch as the expiration of the life of patents yet to be granted is incapable of prediction, it is plain, as the solicitors for the defendant point out, that Alemite's sub-licensing rights under the Standix patents, present and future, may on Alemite's choice continue far into the future.

What royalty obligations Alemite is under to Lubrica-

tion by virtue of the agreement of July 7, 1932, does not appear. The agreement does not specify on that point. That Alemite is under a royalty obligation, however, would seem to be true. The royalties to be paid were probably desired to be not disclosed in the agreement and were therefore made the subject of a separate document. The agreement of July 7, 1932, itself in the termination clause clearly indicates that there are continuing obligations on Alemite's part because the termination, it is provided, "shall not relieve Alemite of any of its obligations to Lubrication which shall have accrued prior to the date of such termination." That among those obligations were royalty payments, though not stated, is rather clearly indicated by two provisions in the contract. One is that the right to export freely between the United States and Canada is given "without payment of additional royalty" (Par. 1) ; and the other is, that Alemite is licensed and may grant sub-licenses as to cartridge attaching machines, which seem to be made a special case, "upon which royalties are paid under this License Agreement" (Par. 2). It is hardly to be supposed that Alemite's payment of the cash sum was in full compensation for important rights that ran so far into the future with respect to inventions that are of such manifest importance as those forming the subject matter of the contract. Furthermore, Alemite's right to terminate the agreement is a rather positive indication of the existence of burdens on Alemite that continue currently with Alemite's enjoyment of the license.

While nothing can be asserted with positiveness as to details touching these continuing obligations, yet it seems well within the bounds of reason to say that those obligations embraced royalty payments. The usual practice in such matters, combined with the rationale of the termination provision and particularly with the clear imputations of royalty dues found in the agreement itself, lead to the conclusion, which in the absence of allegations to the con-

trary should be accepted, that the agreement of July 7, 1932, placed Alemite under continuing royalty obligations to Lubrication so long as the agreement with it remains in force.

The bill alleges also that the complainant and defendant entered into another contract evidenced by a series of letters, herein called the "letters" contract, whereby the defendant agreed to supply and ship to the complainant within ten days of receipt of the complainant's orders therefor all couplers and nozzles made and marketed by the defendant or which it might bring out in the future. The defendant has developed and brought out certain new "hydraulic fittings" (covered by the Standix patents), which for reasons not necessary to explain appear to be quite essential to the complainant to supply to the trade if it is to be able to maintain its position as the competitor of others, including the defendant, engaged in the business of supplying lubricating equipment especially for use in connection with automobiles. The bill alleges that since July 2, 1932, the new hydraulic fittings have gone into extensive use on automobiles. A certain coupler known as an "hydraulic" coupler or adapter has been brought out by the defendant and the complainant alleges that by reason of the new fittings the complainant, if its trade is to be kept, must be able promptly to supply to its jobbers and customers the hydraulic adapter. Yet, the bill alleges, the defendant while supplying the demand of its own trade and that of others with the new hydraulic adapters, deliberately in disregard of the letters contract refused to fill the orders of the complainant within the times therein specified; that the delays in filling the orders were purposeful and in the interest of unfairly injuring the complainant in the trade. Since the bill was filed the orders have been filled.

Not only so, alleges the bill, but the defendant has further sought to injure the complainant in its business by

circulating false reports among the trade at large and particularly among the complainant's distributors, jobbers, dealers and customers, and prospective customers, and to the users and prospective users of the complainant's lubricating equipment, that the complainant is without license under any of the Standix patents, that for want of such license the complainant would be unable in the future to sell compressors or pumps with the hydraulic adapter for connection with hydraulic fittings, that the complainant would have to go out of business for the want of a license under the Standix patents and that litigation was impending with respect to the complainant's rights, whereby the complainant's business has been greatly injured.

The foregoing are all the facts disclosed by the bill which seem to be necessary to be set forth as a predicate for consideration of the points raised by the demurrer.

## DEMURRER.

Before noticing the specification of grounds upon which the demurrant relies, it is necessary to look to the prayers. Only by examining them can the points raised by the demurrer be given their setting.

Injunctive relief, preventive and mandatory, is prayed, together with an accounting for damages suffered and profits lost from the defendant's alleged unlawful acts described in the bill.

The preventive relief is that the defendant be enjoined from

(a) Any act of commission or omission which would jeopardize or tend to jeopardize the complainant's license rights under the Standix patents.

(b) From instituting, prosecuting or maintaining any suit or action at law or in equity with respect to the complainant's rights in the premises.

(c) From threatening to sue or from in any way intimidating the complainant's trade and customers by

representations with respect to litigation about the complainant's rights in the premises.

(d) From representing to the trade or the complainant's customers that the complainant is without license under any of the Standix patents.

(e) From representing to the trade or the complainant's distributors, etc., that the complainant is or will be unable in the future to supply lubricant compressors equipped with hydraulic adapters.

(f) From representing to the trade, etc., that the complainant would in the near future be compelled to go out of business for want of a license with respect to the Standix patents or for any other reason.

The mandatory relief is that the defendant, through a mandatory injunction, be required and commanded

(a) To exercise its option under its agreement with Lubrication to keep said agreement in full force and effect (at least with respect to the complainant's license rights under the Standix patents) for the life-term of the last expiring Standix patent.

(b) To exhibit and offer to deliver to the complainant a formal written non-exclusive life-term license with respect to the Standix patents which will, at the complainant's option, remain in full force and effect for the life of the Standix patents including the last expiring patent (subject only to the terms and conditions of the agreement of April 22, 1932).

(c) To supply and ship to the complainant within ten days of receipt of the complainant's orders, complainant's *bona fide* requirements of any of the defendant's so-called couplers or nozzles or adapters, including hydraulic adapters, in accordance with the letters agreement, subject only to any delay or inability on the part of the defendant due to or caused by causes beyond the defendant's control.

The facts supplemented by the prayers show that the

complainant's case is possessed of five phases or parts. They are:

First. Alemite's threat to jeopardize Gray's license rights under the agreement of April 22, 1932, with respect to the Standix patents by failing to keep in force its license agreement with Lubrication for the life of the Standix patents, present and future. The complainant seeks to enjoin the defendant from doing or omitting to do any thing which continues that jeopardy and specifically to require the defendant to exercise its option of renewal of its agreement with Lubrication so as to keep it in full force and effect, thereby removing the alleged jeopardy.

Second. Alemite's failure to exhibit and offer to deliver to Gray the formal non-exclusive license agreement under the Standix patents which would at Gray's option continue in full force and effect until the expiration of the latest patent covered thereby (meaning of course the Standix patents). A mandatory injunction is prayed asking that Alemite exhibit and deliver the formal non-exclusive license agreement, on tender of willingness to pay the stipulated twenty thousand dollars therefor being made.

Third. Alemite's failure to fill Gray's orders in accordance with the letters contract. A mandatory injunction is prayed as the appropriate relief against Alemite's failure in that regard.

Fourth. The unfair discrimination by Alemite against Gray in favor of itself and other competitors of Gray in the matter of filling orders for hydraulic adapters. This ground of complaint is allied to the third. The third rests on the theory of specific performance of a contract, whereas this ground, the fourth, rests on the theory that Alemite by delaying the orders is engaged in unfair trade practices against Gray and thereby has damaged Gray in its business, goodwill and reputation. The prayer for an accounting would embrace the relief sought under this head of the case.

Fifth. Unfair trade practices by Alemite against Gray, which consist not alone of Alemite's unjustified delay in filling orders as just referred to, but as well of false representations to the trade and to Gray's distributors, etc., that Gray has no rights under the Standix patents, etc., accompanied with threats of suit, and statements that Gray could not continue in business, which false representations, threats and statements are said to constitute trade libel and slander. Preventive relief is sought against the continuance by Alemite of these acts of alleged wrong.

Having thus outlined the phases of the complainant's grievances which the bill presents, it is now in order to examine the specific objections to the bill which the demurrer assigns.

1. Gray seeks by way of mandatory injunction a specific performance of the contract between it and Alemite dated April 25, 1932. Its right to such relief is to be tested by the principles applicable to the law of specific performance. *New York Johnson Motor Co. v. Johnson Motor Co.,* 15 *Del. Ch.* 356, 138 *A.* 603. Equity will never decree specific performance of a contract where its terms are so unequal that to require the defendant to carry it out would be to load him with hard and oppressive burdens. The contract which the complainant here seeks to compel the defendant specifically to perform, assuming without deciding that its terms are to be construed as the complainant contends, is a contract most unequal in its mutual rights and obligations. As contended for by the complainant it amounts to this—that Alemite should, without knowing from experience whether its license agreement with Lubrication will prove a source of loss or profit to it, now abandon its right of cancellation and now elect to continue that contract with its burden of royalty obligations into the indefinite future, so long as any existing or future Standix patent is alive, and grant to Gray a sub-license under those patents for a similar indefinite length of time. Now the

hardness of that proposition is conspicuously apparent when it is remembered that Gray has the right under its agreement of April 22, 1932, at any time on three months' notice to say to Alemite—"I elect to terminate all license agreements with you." If the court should force Alemite into an indefinitely long contract with Lubrication, it could be justified only as a method of getting for Gray the Standix rights. Gray would have Alemite incur indefinitely long and continuous obligations to Lubrication in order that it, Gray, might use Lubrication's patent rights, and at any time, instantly if Gray chose, after the court had forced Alemite into that long commitment with its continuing obligations, Gray might cancel its agreement with Alemite. In that event Gray would depart free of all obligations to Alemite, leaving the latter through the indefinite years to carry its load of obligations to Lubrication. If that be the meaning of the contract, as is contended, it is far too unequal in its mutuality ever to warrant a court of equity in riveting its chains upon Alemite, and Gray should look solely to law for redress by way of damages in case of breach. Equity will not decree the specific performance of an inequitable contract. *Godwin v. Collins,* 3 *Del. Ch.* 189, affirmed 4 *Houst.* 28; *Sharpley v. Sharpley,* 15 *Del. Ch.* 112, 132 *A.* 139; *Clough v. Cook,* 10 *Del. Ch.* 175, 87 *A.* 1017; *Diamond State Iron Co. v. Todd,* 6 *Del. Ch.* 163, 14 *A.* 27. "The contract must be perfectly fair, equal, and just in its terms and in its circumstances. The contract and the situation of the parties must be such that the remedy of specific performance will not be harsh and oppressive." *Pomeroy, Equity Jurisprudence,* (3d Ed.), § 1405.

2. An injunction is sought against the exercise by Alemite of its right to terminate its agreement with Lubrication. That is what the preventive relief designated above as (a) amounts to. What has already been said is applicable as a reason for denying this relief. Conceding that Alemite has no right against Gray's consent to terminate

its relations with Lubrication, yet Gray is not entitled to relief by way of injunction. To grant injunctive relief against Alemite preventing it from any act of commission or omission which would jeopardize Gray's rights to a license under the Standix patents for the period of the last expiring one, would be but to take one step in the direction of compelling Alemite to continue indefinitely with the Lubrication agreement. For the reasons already stated, that would be so inequitable that equity should decline to decree it. If the case were shown to be one where Alemite proposed to cancel its existing agreement with Lubrication in some way so as to make of the cancellation a subterfuge and a mere fraudulent scheme to drop Gray alone from the Standix family, if I may use the expression, another face might be put upon the matter. But there is no pretense that such is the case.

3. The bill seeks to enjoin the defendant from instituting or maintaining any suit against the complainant either at law or in equity. There is no allegation of any suit pending. Neither is there any allegation of a suit threatened. The demurrer objects therefore to the relief prayed for as having no basis of fact allegation to support it. The objection is well taken. The injunctive process will never issue to allay mere apprehensions. *State of Connecticut v. Commonwealth of Massachusetts,* 282 *U. S.* 660, 51 *S. Ct.* 286, 75 *L. Ed.* 602; 33 *C. J.* 42.

4. It is objected that the bill is multifarious. The first and second phases or grounds of complaint and the relief asked thereunder seek in substance to compel the defendant to keep alive its license agreement with Lubrication so long as the last of the Standix patents, existing and future, shall live, to the end that the defendant may be able to give rights of indefinite duration under those patents to the complainant; and that after the defendant has thus been compelled to continue its relations with Lubrication for complainant's benefit, it shall thereupon exhibit and offer

to the complainant a non-exclusive license agreement under the Standix patents lasting through the indefinite future, and terminable at the option solely of the complainant. With respect to the other three phases or grounds of complaint, a common thread may be said to run through them all. That thread is a purpose by unfair practices to injure and defame the complainant in the conduct of its business, a business with which the defendant is in competition. Those last three causes are so hinged around a common point, that together there may be said to be a unity between them. They are three aspects in which a common purpose is alleged to have displayed itself. That being so they may be united in one bill. *Ripka, et al., v. Gwinn, et al.,* 14 *Del. Ch.* 101, 122 *A.* 137; *Perrine, et al., v. Pennroad Corp., et al., ante p.* 106, 168 *A.* 196.

The solicitors for the complainant urge the view that the first two grounds of complaint are also related to the same common theme that runs through the other three, that theme being a course of action designed to injure if not to destroy the complainant in the pursuit of its business; and that being so, the first two causes of action may properly be retained in the present bill.

The trouble that I find with this view is, that the first two so-called causes of action are not put forward as auxiliary evidence of the defendant's purpose to injure the complainant by conduct injurious to its trade, in other words as specific behavior confirmatory and corroborative of the defendant's imputed unfair design against the complainant's business as set forth in the other three causes. They are put forward as distinct grounds for relief. Now since, for the reasons before stated, equity should decline to recognize them as grounds for the relief asked, it becomes immaterial upon the question of multifariousness to determine whether they are so related to the other grounds of complaint as would, were the relief asked against them proper, permit them all to be heard in one suit.

If the bill contained only the first and second causes of complaint as grounds for the relief which is asked against them, a demurrer would be sustained. Let their logical connection then with the other items of grievance be conceded to be close, they nevertheless should not be retained before the court as basis for relief.

It is conceded that the so-called fifth cause of action states a case cognizable in equity. The so-called third and fourth causes of action, though herein described as separate causes, are related to the fifth, and the three together appear to constitute a group of acts going to establish unfairness in trade practiced by the defendant against the complainant. If the bill were confined to the matters covered by the third, fourth and fifth grounds of complaint, it would be unobjectionable on the ground of multifariousness.

Before concluding my observations upon the demurrer notice should be taken of the argument advanced by the complainant that as the bill alleges that Alemite now has the full power and right under its agreement with Lubrication to license Gray under the Standix patents for the life-term of the longest of them, the defendant who by its demurrer admits every well pleaded allegation cannot deny that the effect of that contract is to equip Alemite with the right and power alleged. Neither can the demurrant deny, it is said, what the bill alleges to the effect that Gray's contract with Alemite gives Gray the right to a sub-license agreement as fully as Alemite's right and power, present as well as potential, permits. It has been assumed throughout this opinion, without passing upon the point (a debatable one) that the view of the complainant is correct in this regard. But even so, the point becomes more or less academic, in view of the considerations which are found discussed in the foregoing as controlling the court in its administering of the relief of specific performance or its indirect injunctive equivalent.

The contention is made by the solicitors for the defendant that the bill shows inconsistency in that it alleges full license rights in Gray under the Standix patents by virtue of the contract of April 22, 1932, and in other of its paragraphs alleges the necessity of a formal sublicense agreement in order for Gray to possess those rights. I do not think there is any inconsistency in those branches of the bill. The sub-licensing agreement is not sought as a grant of right. It is sought as a matter of formal evidence of a right which the complainant contends it already has in less demonstrable or exhibitable form—a form which it contends the defendant agreed to give. Even if the April 22, 1932, agreement confers on Gray Standix rights in the indefinite future, a question which is assumed but not decided, there is no inconsistency in the complainant's seeking the further formal agreement which Alemite contracted to give. But in view of what has been said under the points of demurrer numbered above as 1 and 2, the question of inconsistency in the particular referred to becomes of no moment.

The demurrer is good in part and bad in part, as indicated in the foregoing.

### RULE FOR PRELIMINARY INJUNCTION.

The complainant obtained a rule directed to the defendant to appear and show cause why a preliminary injunction should not issue "restraining and enjoining it from instituting, prosecuting or maintaining any suit or action at law or in equity with respect to the agreements recited in the bill of complaint herein, and from in any way changing its status or rights under its agreement of July 7, 1932, with The Lubrication Corporation."

That a preliminary injunction should not issue restraining the defendant from in any way changing its status or rights under the Lubrication agreement, follows from what has been said in disposing of the demurrer; for

the only change of status to which the complainant has reference is that which is involved in the possibility of Alemite's terminating the Lubrication agreement in 1938 or later.

As to suits at law or in equity which Gray seeks to enjoin Alemite from instituting or maintaining, brief reference to the facts and the law are requisite.

In the first place it is settled that the prospect of being harassed and vexed by future litigation is not a ground, generally speaking, for equity's protective remedies. *Allied Chemical & Dye Corp. v. Steel & Tube Co.*, 14 *Del. Ch.* 368, 127 *A.* 414. There must be some special reason cognizable in equity other than the mere fact of possible prospective litigation to justify interference by injunction with a party's right to sue. When suit has been instituted in a court of equity and the defendant later inaugurates a suit in another court against the complainant involving the same controversy, the latter suit will be enjoined. *Connecticut Mutual Life Ins. Co. v. Merritt-Chapman & Scott Corp.*, 19 *Del. Ch.* 103, 163 *A.* 646.

No suit has been instituted elsewhere by the defendant against the complainant and so there is no room for application of the last cited case.

Excepting a matter about to be mentioned, the defendant has not threatened or in any sense intimated that it proposes or contemplates suing the complainant on the agreements. All that the complainant can say is that it apprehends a suit may be brought by the defendant. But an injunction should not now issue on that showing. If the defendant should sue elsewhere, it will then be time for the complainant to consider whether the suit is such a one as entitles it to have the prosecution of it enjoined while the instant one is pending.

The matter referred to a moment ago relates to the $20,000.00 which Gray was to pay to Alemite for a formal sub-license under the Standix patents. In a letter, Alemite

gave some indication of a possible purpose to sue Gray for the $20,000.00. Of course none of the installments making up the $20,000.00 total can possibly be due from Gray to Alemite until Alemite has first exhibited and offered to Gray such a formal sub-license agreement as the contract between the parties calls for. Alemite claims to have exhibited and offered such a formal sub-license agreement as the contract calls for. Gray denies this. The controversy on this point turns on whether Gray is entitled to a formal agreement that lasts as long as the longest term of any patent now or hereafter acquired by Lubrication. Gray says it is; Alemite says the duration of Gray's rights can be only coterminous with Alemite's which are terminable at its option, and the agreement exhibited and offered by it accords with its contention. Gray, adhering to its contention, has rejected the tender.

Now Gray asks that Alemite be enjoined from suing for any part of the $20,000.00. Such a suit would have to be at law. Alemite's right to recover would depend entirely upon whether it could show that it had exhibited and offered to Gray the formal agreement stipulated for. If Gray could show that such an agreement had not been exhibited and offered, it would have a perfect defense at law.

Where there is a defense cognizable at law the possessor of it has an adequate remedy at law and equity will not enjoin his adversary from suing. *Pefkaros v. Harman, et al., ante p.* 238, 174 *A.* 124; *White, et al., v. Osserman, et al.,* 16 *Del. Ch.* 39, 139 *A.* 761; *Di Luchio v. Otis Oil Burner Corp.,* 15 *Del. Ch.* 39, 135 *A.* 482. In such case there is no occasion for equity's interference.

As the formal agreement which Gray desires Alemite to offer to it is one that this court for the reasons before stated will not compel Alemite to execute, it is apparent that Gray cannot retain before the court that portion of its bill which involves the point on which the $20,000.00

liability turns. Therefore in the event that Alemite commences an action at law in which the point will be litigated, it will not be a case where a party who is a defendant here seeks to withdraw the same controversy to another forum for adjudication and so *Connecticut Mutual Life Ins. Co. v. Merritt-Chapman & Scott Corp., supra,* would have no application.

The rule for preliminary injunction will be discharged, and the outstanding restraining order vacated.