213 A.2d 848 (1965)
Alena LANK, William D. Lank, Sarah L. Marsh and Anne W. Westphal, Plaintiffs,
v.
Edmund F. STEINER, Elsie L. Steiner, and the President, Directors and Company of the Farmers Bank of the State of Delaware, a corporation of the State of Delaware, Administrator Cum Testamento Annexo of the Estate of John C. Lank, Deceased, Defendants.
Edmund F. STEINER and Elsie L. Steiner, his wife, Plaintiffs,
v.
William D. LANK, Administrator of the Estate of Alena Lank, Deceased, Defendant.
Court of Chancery of Delaware, New Castle and Essex.
September 10, 1965.
Aubrey B. Lank and Victor F. Battaglia (of Theisen & Lank), Wilmington, for plaintiffs in Civil Action No. 1852 and for defendant in Civil Action No. 219.
Houston Wilson, Georgetown, for defendant in Civil Action No. 219.
*849 Jackson W. Raysor (of Tunnell & Raysor), Georgetown, for plaintiffs in Civil Action No. 219 and for defendants, Edmund F. Steiner, and Elsie L. Steiner in Civil Action No. 1852.
H. Edward Maull, Georgetown, for defendant, The President, Directors and Company of the Farmers Bank of the State of Delaware in Civil Action No. 1852.
SEITZ, Chancellor:
We have here two lawsuits which raise essentially the same issue, viz., the validity of options to buy corporate shares. If valid, the purchasers thereunder ("Steiner faction") will obtain absolute voting control of the corporation involved. The other group, the Westphal faction, seeks by one of these actions to invalidate the option agreements. In the other action the Steiner faction seeks specific performance of the attempt to exercise the options.
This is the decision after final hearing in both actions.
A chronological recitation of the facts is necessary background for the disposition of the issues raised. John C. Lank ("Lank") and his wife Alena ("Alena") or ("the Lanks") were lifelong residents of Milton, Delaware. They had four children, William D., Sarah (now Marsh), Elsie (now Steiner) and Anne W. (now Westphal).
In 1954 one of the Lank's sons-in-law, Edmund Steiner ("Steiner") was asked by another son-in-law, George Westphal ("Westphal"), to be on the lookout for a good business for him, since he was planning to retire from the Army in a year or so. Steiner learned that the physical assets of what later became H. R. Phillips, Inc., were for sale. They consisted of assets used as an oil commission distributor for Socony Oil Company. H. R. Phillips, Inc., ("corporation") was incorporated in 1954 to purchase the assets. It had a total investment of $45,000; $15,000 supplied by Westphal, $15,000 by the Steiners, and $15,000 by the Lanks. Westphal received 150 shares and, apparently, the Steiners together received 150 shares. Lank received 100 shares while his wife received 50. The shares held by the Lanks are the ones involved in this litigation.
Lank was secretary and treasurer of the corporation and remained treasurer until his death. While almost all members of the three families at one time or another have served as directors or officers, the active management of the company was left to Steiner and Westphal who were both directors at the times here pertinent. They operated the corporation with the relaxed informality which is so characteristic of this type of operation. The situation remained in this posture for several years with Westphal as president. The business apparently prospered.
Later in the fifties Service Oil Co. ("Service") was organized with $40,000 lent by the corporation. Service is a retailer of oil products. Organization of this company was prompted by a desire to reap a greater profit spread on sales than was possible from the corporation alone. Westphal and Steiner were the principal shareholders of Service. The Lanks were never asked if they would like to share an interest in Service, but this is not an issue in this case. Service was not a financial success.
In 1959, at the age of 81, while surveying, Lank contracted pneumonia and was confined to Milford Hospital. After his release, while he recuperated, the Lanks lived with their daughter, Elsie Steiner. Lank had a relapse and was again hospitalized. Still later in 1959 a growth developed on Lank's spine, the result of which was the loss of the use of his right hand. Another period of hospital confinement followed, this time in Wilmington. In late 1959, Lank returned to his home in Milton. There, he required around-the-clock nurses until about March 1960.
In the late summer or early fall of 1960 negotiations for the sale of the corporation were opened with Messrs. Foley and Wright of Passaic, New Jersey. These *850 negotiations were carried on in large part by Westphal, the then president, with occasional help from Steiner. In late 1960 these negotiations resulted in a substantially firm offer of $300,000 for the assets of H. R. Phillips, Inc. and Service Oil Co. The amount of all liabilities does not clearly appear. Later the Wright-Foley offer was reduced to $275,000, or about $600 per share, but still no contract was ever concluded because of the demands of a minority stockholder of Service. Neither Steiner nor Westphal was responsible for the failure to consummate the sale.
Before the Wright-Foley deal finally collapsed a collateral event of significance here was taking place. As background to this event, I should say that I find that Westphal and Steiner, to Lank's knowledge, started to have trouble as early as 1960, and in my opinion both appreciated the importance of the Lank shares in connection with control of the corporation and wanted to buy Lank's stock. Although he denied it, I conclude that in March of 1961 Westphal, then President, offered to trade some long term securities owned by him for Lank's stock in the corporation. Lank felt that Westphal was trying to cheat him. I need not consider whether any cheating was intended, but I do feel that Lank's attitude toward Westphal worsened. Lank then expressed the desire to Steiner that Westphal never acquire any of his stock in the corporation. In order to effectuate this purpose Lank offered to sell his stock to Steiner. At the time Steiner said he was not in a position to make the purchase and so suggested that Lank give him an option to purchase the shares. Parenthetically, Mrs. Lank relied on her husband in business matters and followed his lead. The Steiner proposal was acceded to and Steiner had his attorney draw up two option agreements under seal which were dated March 28, 1961.
One option agreement covering 100 shares was signed by Lank and Edmund and Elsie Steiner[1]. The other, for fifty shares, was signed by Mrs. Lank and Edmund and Elsie Steiner. Gladys Jones, the housekeeper, witnessed both option agreements. They were made binding on their estates.
The recited consideration in each case was $10, and mutual promises and understandings. I find that the $10 was paid in each case. The optionees were given the right to purchase the shares or any part thereof at book value exclusive of good will at the date of exercise. The option was to be for 10 years from the date of the option with a right of renewal for an additional five years for $10. The exercise of the option with respect to less than all the shares did not terminate the option with respect to the balance. It does not appear that Lank was represented by counsel at the time.
It is not clear exactly who suggested book value as the option price, but it does appear that when Lank asked Steiner what the value of the stock was, he replied that its book value was $270 per share, which was about right. After Lank's death in May 1963 and his widow's death in September 1963, the Steiners attemped to exercise their options within the time provided in the agreements. The appropriate parties refused to deliver the stock and this litigation resulted.
The Lank heirs, other than Elsie Steiner, (the present plaintiffs in Civil Action No. 1852) and the Administrator of the estate of Alena Lank (defendant in Civil Action No. 219) will be designated as "plaintiffs". The Steiner interests will be denominated "defendants".
Before considering plaintiffs' basis for attacking the validity of the options, it is of some moment to make clear that plaintiffs do not contend that the Lanks lacked mental capacity to create the options at the time they were granted. The plaintiffs' first contention is that the options violate a resolution, which they describe as a by-law *851 of the corporation, which provides in pertinent part that, "* * * any stockholder wishing to dispose of his interest in the corporation to other than existing stockholders must first offer his stock, at book value, to the remaining stockholders * * * before other disposal can be made." (emphasis added). The parties question the validity of the restriction and whether or not it is in fact a by-law of the corporation, since it was in the form of a stockholder's resolution. I find it unnecessary to make a decision on these issues. As the language emphasized above shows, only when a shareholder wished to sell to an outsider was he required first to offer his stock to existing shareholders. Plaintiffs do not challenge the fact that the Steiners were "existing shareholders". Since the Lank options ran to them, I find that they did not violate the restriction. It is not for the court to remake the agreement. Under the circumstances, I need not consider any argument concerning the validity of the resolution.
Plaintiffs next argue that this case falls within the rule of Strong v. Repide, 213 U.S. 419, 29 S.Ct. 521, 53 L.Ed. 853 to the extent that under special circumstances a director of a corporation occupies a fiduciary relation when dealing with a shareholder for the purchase of his shares of stock. The argument is that when, about the time the options were executed, Lank asked Steiner what the value of the stock was, Steiner breached his fiduciary duty when he replied that its book value was $270. Plaintiffs contend that Steiner had a duty to explain that, based on a recent offer by Wright and Foley, the true value of the stock was greatly in excess of its book value, viz., $600 (less liabilities) versus $270.
First, it must be noted in the Repide case, supra, the director who breached his fiduciary duty in failing to disclose a pending sale of the corporation did not deal personally with the shareholder, but chose instead to keep his identity a secret. This element of secrecy is absent in the present case. Secondly, in Kors v. Cary, 39 Del.Ch. 47, 158 A.2d 136, this court recognized that the special circumstances rule applies only where a director "* * * possessed with special knowledge of future plans or of secret and untapped resources deliberately misleads an ignorant stockholder * * *." What are the facts here?
The only element in this case that might be "* * * special knowledge of future plans * * *", which could have affected Lank's desire to grant an option at book value, is the value of his stock based on Wright and Foley's offer, which, it is contended, reflected the true value of the business. The plaintiffs' argument overlooks one significant fact, viz., John C. and Alena Lank, along with all other shareholders of the corporation, signed a resolution at the October 30, 1960 stockholders' meeting authorizing the sale of the assets of the company for a minimum of $275,000. This resolution was adopted pursuant to a disclosure to the shareholders that negotiations were under way for the sale of the company at a price in that general area. There is no suggestion that the Lanks did not comprehend what they were doing. Indeed, during the subsequent negotiations Lank suggested that he receive stock rather than cash so as to postpone paying tax on the gain.
I cannot find any material change of circumstance between the 1960 stockholders' meeting and the date of the execution of the options in 1961 which would justify the conclusion that the Lanks were not then aware of the disparity between book value and the fair share value based on the still inchoate Wright-Foley offer. During the period commencing before and extending well beyond the date of the execution of the options Lank, while old and sick, was in full control of decisions affecting his property.
Steiner, at most, failed to disclose only that of which both Lanks already had knowledge. The explanation for the granting of the options at book value despite *852 their knowledge of true value is reasonable in the setting. First, I accept the testimony that, although the option agreements did not so provide, Steiner orally agreed not to exercise them while the Lanks lived. Thus, Lank acted on the assumption, with which Steiner tacitly concurred, that he would get the profit if the stock were sold during his lifetime. However, he was content to let Steiner have its worth above book value after his death if he exercised the options. This makes sense in the setting as I evaluate it. I say this because I am satisfied that the Lanks wanted Steiner rather than Westphal to get the stock and he did not refine his thinking beyond these two personalities and perhaps the greater attention given by Steiner's wife. Additionally, Lank noted that book value was substantially above his investment.
I conclude that plaintiffs' contention based on an alleged breach of duty by Steiner as a corporate fiduciary lacks merit.
The plaintiffs next contend that irrespective of the Repide case theory, the Steiners occupied a position of trust and confidence with respect to the Lanks, and that therefore a presumption against the validity of the options arises since the Steiners obtained thereby possible benefits at the Lanks' expense. There can be no doubt that in an appropriate case such a presumption exists. Compare Peyton v. Wm. C. Peyton Corporation, 23 Del.Ch. 321, 7 A.2d 737, 123 A.L.R. 1482; Pomeroy, Equity Jurisprudence, 5th ed., § 956, p. 790. However, the application of this doctrine requires as a prerequisite the finding of the existence of a fiduciary relation between the parties to the transaction. A fiduciary relationship is defined as a situation "where one person reposes special confidence in another, or where a special duty exists on the part of one person to protect the interests of another, or when there is a reposing of faith, confidence, and trust, and the placing of reliance by one person on the judgment and advice of another". 36A C.J.S. Fiduciary p. 385.
An analysis of the facts in this case discloses no such dependence by the Lanks on the Steiners. I say this mindful of the fact that over the years Lank looked to Steiner for information concerning the corporation and that they had an opportunity to ingratiate themselves with this old couple. There is voluminous testimony to the effect that Lank remained to his death a very independent man. Certainly that was true at the crucial date when he and his wife executed the options in 1961. Indeed, some time subsequently, it took several members of the family, none of whom the elder Lank had reason to distrust, several weeks and much concentrated effort to convince Lank to cell certain property (not here in issue) which was and could be, in their opinion, only a losing proposition. Moreover, the errands which Steiner did for the Lanks never involved giving them advice nor any exercise of discretion. While Steiner often did the "legwork" for Lank, it was always the latter who made the final decisions. If any conclusion can be drawn from the testimony concerning the relationship of the parties it is that Lank suffered his children to do only those things for him which were physically impossible at his age. Even in these instances there are overtones in the record of the resentment that older people, who have been independent all of their lives, feel when they are forced to depend on their children for necessities. Also, Elsie Steiner signed Lank's signature to checks, but only when he was present to oversee the transaction. I conclude that, while a favorable family relationship appears to have existed between the parties, no fiduciary one did.
It is true that Lank relied upon Steiner for advice concerning the corporation's affairs. But, I find no evidence that he was misled or that any conscious exploitation of this relationship was the basis for the granting of the options. The cold fact is that the Lanks "played favorites" for reasons they deemed sufficient, and at a time when as a matter of fact and law they were free to do so.
*853 Under the facts, as I find them, I cannot say that the Lanks' failure to obtain independent legal counsel calls for the application of the rule in the Peyton case.
Having found no merit in any of the plaintiffs' contentions, it follows that plaintiffs' complaint must be dismissed. In the action by the Steiners an order will be entered directing the appropriate parties to specifically perform the option agreements under its terms.
Present order on notice.
NOTES
[1] It is suggested that Lank then had only 99 shares, but I deem this unimportant here.