CRAFT BUILDERS, INC., a corporation of the State of Delaware, Defendant Below, Appellant,

v.

ELLIS D. TAYLOR, INC., a corporation of the State of Delaware, Plaintiff Below, Appellee.

Supreme Court of Delaware.

May 13, 1969.

Joseph T. Walsh, Wilmington, for defendant below, appellant.

David A. Eastburn and Edmund J. Bodziak, Wilmington, for plaintiff below, appellee.

WOLCOTT, C. J., and CAREY and HERRMANN, JJ., sitting.

CAREY, Justice:

This is an appeal from an order of the Court of Chancery directing the specific performance of a contract to purchase land and refusing to order recission of the contract. The appellant, Craft Builders, Inc. (Craft), agreed in writing to buy the property from the appellee, Ellis D. Taylor, Inc. (Taylor), but later refused to complete the purchase on the alleged grounds of mutual mistake of fact and unforeseen hardship. The Chancellor's ruling was made after a trial, at which much of the evidence was presented by oral testimony. It is alleged that the Court below erred in concluding (1) that there was no mutual mistake of fact justifying recission, and (2) that specific performance would not impose undue hardship upon Craft.

The Chancellor made extensive findings of fact and conclusions of law. The appellant agrees that there was ample evidence to justify the Chancellor's findings of basic facts, but challenges the inferences drawn therefrom. The Chancellor had the privilege of hearing and observing the witnesses as they testified. We accept his basic findings, Lank v. Steiner, 42 Del.Ch. 456, 224 A.2d 242, and approve his conclusions based thereon.

The facts so found are these: Ellis D. Taylor is the president and sole stockholder of Taylor. Joseph Girsh and Richard Hanning and their wives are the only stockholders and officers of Craft. Taylor owned a lot in New Castle County, zoned M–2 (industrial), which it agreed to sell to Craft for $30,000.00. A written agreement to that effect was drafted by Taylor's attorney, Bayard Allmond, Esq., and was signed by the parties on July 12, 1965. Craft paid Taylor a deposit of $2,500.00. This agreement was contingent on Craft's obtaining a change in zoning to R–4 (residential), because Craft was desirous of building an apartment on the lot. Settlement was to be made on March 1, 1966.

While the agreement was being typed, Craft's representatives asked Mr. Allmond to represent it in obtaining the desired rezoning. He agreed to do so with respect to the proceedings before the zoning authorities; he pointed out, however, that he was reasonably sure that the Levy Court would not grant final rezoning until the building site and plans were approved by the Regional Planning Commission (R.P.C.), despite the fact that the law did not expressly require approval of R.P.C.

It should here be mentioned that, before the original contract of sale was signed, Mr. Girsh and Mr. Hanning inspected the site, which is bounded on one side by a small creek. They concluded that flooding was not a problem. In August, 1965, however, they visited the owners of an adjoining parcel and were informed that there was a serious flooding problem with respect to Taylor's land.

The Zoning Commission approved the requested rezoning on August 9, 1965, but Mr. Allmond was informed that the Levy Court would not do so unless both parties filed a restriction prohibiting any building until approval was obtained from R.P.C. The restriction was drawn up and recorded, and the Levy Court approved the rezoning on February 15, 1966.

By March 1, 1966, the agreed settlement date, R.P.C. had not ruled upon Craft's site plans. During the preceding month, certain letters had been exchanged between Mr. Allmond and Mr. Girsh concerning the settlement. In a letter dated February 25, 1966, Mr. Girsh informed Mr. Allmond that Craft would not be prepared to make settlement on March 1, 1966, because the zoning uncertainty created financing problems; he accordingly asked that the closing date be extended for sixty days, stating in his letter, " * * * we will make the 90 days the deadline and if Regional Planning approves our plan prior to this date we shall make settlement five days after the plan is approved, with the understanding that the 90-day limit shall be adhered to." Shortly thereafter, Mr. Allmond talked with Mr. Girsh by telephone and was told to

prepare a written agreement extending the time for settlement. During the conversation, Mr. Girsh stated in effect that, if Taylor agreed to the extension, Craft would then make settlement whether or not R.P.C. approval had been obtained. Mr. Allmond conveyed this information to Mr. Taylor and, after receiving his permission, drew an extension agreement amending the date of settlement to May 14, 1966. This agreement obligated Craft to settle by that date if title was clear, regardless of R.P.C.'s decision. Mr. Allmond mailed this extension to Craft, along with a letter expressly pointing out the nature of Craft's obligation under this extension agreement. Craft signed the agreement and mailed it back to Mr. Allmond.

On May 14, 1966, R.P.C. still had not decided Craft's application. Mr. Girsh asked for another extension; Mr. Taylor was very reluctant to grant it, but finally did so on the strength of an increase in the deposit of $6,000.00. The extension was for the period of thirty days. On May 23, 1966, the Technical Advisory Group (T.A.G.) of the R.P.C. recommended rejection of Craft's plans because they failed to cope adequately with the lot's flooding problem. This was merely an advisory decision because T.A.G. has no power to make a final ruling. The record does not disclose whether R.P.C. was ever requested to reject the recommendation submitted by T.A.G. According to the testimony of a member of T.A.G., alterations necessary to obtain R.P.C. approval for an apartment building would cost at least $50,000.00.

Thereafter, Craft declined to accept a deed and instead requested the return of its $8,500.00 deposit. This action was later instituted.

■ As indicated above, the extension agreement of May 14, 1966, bound Craft to purchase the property regardless of the R.P.C. decision. Craft seeks to escape from this provision because, it alleges, the parties were mutually mistaken about the nature and effect of the pending R.P.C. de-

cision. Mr. Girsh and Mr. Hanning testified that Mr. Allmond had informed them orally that R.P.C. approval was automatic and that there was nothing to fear on that score; they stated that this incorrect advice induced them to sign the agreement. Mr. Allmond testified that no such statement was ever made; that he told them from the beginning that R.P.C. approval would probably have to be obtained; that they had asked him to represent them before R.P.C., but that he had declined to do so because he had had no experience before that agency and because presentation of a matter before it was really an engineering matter. The Chancellor specifically accepted Mr. Allmond's testimony on this issue. Actually, an engineer employed by Craft to handle the matter before R.P.C. testified that the flood condition could be controlled at a cost within reasonable bounds, in his opinion. We agree with the Chancellor that Craft did not carry its burden of showing, by clear and convincing evidence, the existence of mutual mistake. See Restatement, Contracts, § 511.

■ Craft further contends that it would be inequitable to apply the remedy of specific performance against it because that remedy would impose an undue hardship on Craft since, to make the lot usable for apartments, it would cost a large amount to protect it against flooding. We agree with the legal proposition that, as specific performance is purely an equitable remedy, it will not be granted when enforcement of a contract will produce undue hardship. Gray Co. v. Alemite Corporation, 20 Del.Ch. 244, 174 A. 136. However, the remedy will not usually be denied where the hardship is due to defendant's own acts or is clearly foreseeable. Payne v. Clark, 409 Pa. 557, 187 A.2d 769; 81 C.J.S. Specific Performance § 18. The Chancellor found that extra expense in preparing the site was not unforeseen by Craft when it signed the March 14 extension. There is ample evidence to support that conclusion. The adjoining owner had

told Mr. Girsh and Mr. Hanning in August, 1965, that there was a serious flooding problem. Early in 1966, Mr. Girsh discussed various ways of treating floods on the property with its engineer. Craft knew on the day it approved the first extension agreement that R.P.C. approval was required and that flooding was a problem, although it could not foresee what requirements would be imposed by T.A.G. or R.P.C. Despite that knowledge, it expressly contracted to complete the purchase, regardless of R.P.C. approval or disapproval. In short, it voluntarily assumed the risk of whatever action R.P.C. finally took.

Moreover, there is some doubt that the hardship which Craft visualizes is quite as severe as it suggests. There is testimony that the lot can be used for certain other purposes under the present zoning classification; clearly, Craft is not being compelled to buy an unusable piece of land. We conclude, therefore, that no such .undue hardship exists here as to bar the remedy of specific performance.

Because of the dispute in testimony, the actions of the attorney have been questioned in this case. We think it is proper to point out, as did the Chancellor, that representation of both contracting parties imposes a "heavy burden" upon an attorney. Cf. Holley v. Jackson, 39 Del.Ch. 32, 158 A.2d 803. Of course, in contrast to the situation in *Holley*, Mr. Allmond had no personal interest in the transaction. He represented both buyer and seller so long as their interests coincided, but withdrew completely when they reached the parting of the ways. During the period of his representation, he was duty-bound to see that there was full disclosure and full protection for both parties. He drew the original agreement in the presence of both sides. He wrote the extension agreements after considerable discussion with both parties. He had previously explained to Mr. Girsh that R.P.C. approval was necessary, and in his letter forwarding the then unsigned extension agreement, he told Mr.

Girsh that "you are obligated to settle [by May 14, 1966] regardless of the decision of Regional Planning Commission," and gave no assurance that the decision would be favorable. We find no ground to justify a belief that Mr. Allmond was guilty of any improper conduct.

The judgment below will be affirmed.