**Charles E. COOK and Walter M. Sharp, Plaintiffs,**

**v.**

**R. T. FUSSELMAN et al., Defendants.**

Court of Chancery of Delaware, New Castle.

Dec. 8, 1972.

Richard F. Corroon and Robert K. Payson, of Potter, Anderson & Corroon, Wilmington, and Charles Griffin Cale, of Adams, Duque & Hazeltine, Los Angeles, Cal., for plaintiffs.

Richard J. Abrams, of Richards, Layton & Finger, Wilmington, and Richard H. Keatinge and Frank E. Meridith, Jr., of Keatinge, Libott, Bates & Loo, Los Angeles, Cal., for defendants R. Thomas Fusselman, Donald E. Butler, Robert M. McIntyre and Russel L. Warrick.

Richard L. Sutton, of Morris, Nichols, Arsht & Tunnell, Wilmington, for defendant First Surety Corp.

David Snellenberg, II, Wilmington, and Robert S. Smith, of Paul, Weiss, Rifkind, Wharton & Garrison, New York City, for defendant Harold Florence Drimmer.

MARVEL, Vice Chancellor:

This action of Cook and Sharp, who were then as now the holders of the beneficial interest in approximately 31% of the stock of the defendant First Surety Corporation,[1] a savings and loan holding company doing business in California, was filed on March 1, 1972 for the purpose of seeking to prevent the loss of their rights as controlling stockholders of First Surety, rights which were threatened by the proposed issuance by the then board of directors of the corporate defendant to the defendant Drimmer, a non-director, of 1,000,000 additional shares of First Surety Class A preferred stock, a transaction which if consummated would substantially dilute plaintiffs' then voting strength in the voting stock of the corporate defendant. On the following day, per-

---

1. The principal asset of First Surety is its 100% ownership of Surety Savings and Loan Association of Burbank, California.

The consolidated assets of these corporations were recently valued at $118,500,000.

suaded that the precipitate issuance of the shares in question might represent an attempt on the part of incumbent management to insure the retention of their positions and officer salaries in the corporation rather than constitute a legitimate business transaction designed to raise allegedly needed capital and in order to preserve the status quo pending a more penetrating examination of the situation, a restraining order was entered which prevented the issuance by the defendant First Surety to the defendant Harold Drimmer of 1,000,000 shares of its convertible Class A preferred stock, carrying, inter alia, not only the right of one vote per share, the same right as that existing in the common stock of the company but also the right to an 8% cumulative compound stock dividend, as well as a conversion right of one share of common stock for 3½ preferred shares. Furthermore, the basic agreement[2] between First Surety and Mr. Drimmer contemplated that the latter could, by the exercise of an option to purchase 250,000 additional shares, ultimately acquire more than 50% of the stock of First Surety with a 40% stockholder interest assured to Mr. Drimmer to begin with upon payment by him to the corporation of $1,000,000.

After the case was tried but before argument on the post-trial briefs the so-called Fusselman directors,[3] who had negotiated the purchase and sale agreement with Mr. Drimmer, thereby threatening to destroy plaintiffs' ability to elect a board of directors of First Surety sympathetic to their aims, in mid-November 1972 resigned from the board of directors, which was then reduced in size from eleven to seven members. Mr. Canaday, a supporter of Mr. Cook, was thereupon elected chairman of the board of the corporation, and plaintiffs, the holders of some 31% of First Surety's stock, were placed in a position to assert their now assured control of the latter, a happening which had for many months been resisted by the Fusselman group not only in this Court but also in several other actions in California, in this jurisdiction, and in the District of Columbia.

The case against the Fusselman directors having now been dismissed with prejudice following the resignations of such directors as above alluded to, the defendant Drimmer now seeks leave after trial to file a supplemental answer in the form of a cross claim against First Surety in which he asks for a decree of specific performance of a recently disclosed agreement,[4] dated August 8, 1972, purportedly entered into between Mr. Drimmer and First Surety while the latter was still under control of the Fusselman directors, for the sale of 1,000,000 shares of Class A preferred stock of First Surety to Mr. Drimmer at a price of one dollar per share, for the avowed purpose of increasing the capital of the issuer which might be made available to its subsidiary, Surety Savings and Loan Association, " * * * for expansion and other business purposes." Thus, in return for a proposed payment of $1,000,000 Drimmer hoped immediately to gain 40% of the voting stock of First Surety, leaving the remaining stockholders of the corporation, whose equity in First Surety is approximately $12,000,000, with a 60% balance of relatively dispersed voting power except for plaintiffs' 31% bloc. However, as a result of consummation of the Drimmer transaction, plaintiffs' voting rights would

---

2.  See corporate resolution of First Surety of March 2, 1972 in which it was stated that " * * * the consummation of the offer by the issuance of the series A preferred stock and payment of the purchase price shall be conditioned upon the approval of the Court of Chancery, State of Delaware, and approval of any regulatory agencies if such should be required."

3.  R. Thomas Fusselman, Donald E. Butler, Robert M. McIntyre and Russel L. Warrick. Ray G. Wilkinson, a supporter of the plaintiff Cook's faction, also resigned at the same time.

4.  This agreement contains terms which are more favorable to Mr. Drimmer than those contained in the understanding of March 2, 1972.

be reduced from approximately 31% to approximately 19%. Furthermore, by exercising his option to acquire 250,000 additional preferred shares and then converting them to common shares, Mr. Drimmer, under his agreement with First Surety, hopes to acquire 449,897 shares of First Surety with a liquidation value in excess of $2,500,000 for $1,375,000. Finally, Mr. Drimmer's right to rescind, the escrow arrangement with Irving Trust Company, and the undertaking of First Surety to pay all of Mr. Drimmer's fees and disbursements incurred by the latter in this case in this Court, on any appeals, as well as in any future attack on the transaction in issue, casts doubts on the existence of real arm's length bargaining as between First Surety and Mr. Drimmer.

On December 4, 1972, the Court orally restrained First Surety from disposing of the 1,000,000 preferred shares, which Mr. Drimmer seeks to acquire, until 5:00 p. m. on December 15, 1972, and this is the opinion of the Court on the question as to whether or not a preliminary injunction protecting Mr. Drimmer's claimed right to specific performance should now issue as prayed for as well as on the question as to whether or not the defendant Drimmer should be allowed to file his proposed cross claim for specific performance, or alternatively for damages claimed to have been incurred by him as a result of First Surety's alleged repudiation of the purported August 3, 1972 contract between himself and First Surety, an agreement which is attached to his proposed pleading. The present management of First Surety does not concede that such a contract has been validly entered into.

After plaintiffs had acquired their 31% interest in First Surety and a timely convening of a meeting of its stockholders was thus assured, at which, in the absence of some intervening event of great import, plaintiffs would admittedly prevail, the Fusselman group caused to be published in the Wall Street Journal for three con-secutive days, commencing October 13, 1971, the following advertisement:

> "Savings & Loan
> Association
>
> For Sale—Controlling Interest in profitable California State-chartered savings & loan association
>
> Box 73Z
> The Wall Street Journal
> L. A."

Among those responding to this advertisement was the defendant Harold Drimmer who was initially informed by Mr. Fusselman that what First Surety had in mind in causing the advertisement to be published was to obtain an investment of $4,000,000 in return for the issuance of common shares. Mr. Drimmer, in response, expressed an interest in investing no more than $1,000,000, and while indicating that he might invest other moneys in First Surety at a later date in the amount of $3,000,000, did not obligate himself to invest any additional sums in First Surety, a fact which Mr. Fusselman conceded at trial.

Mr. Drimmer thereafter proved to be a hard bargainer, his demands for a conversion rate of 3½ shares of preferred to one of common, a call provision exercisable after five years at $1.10 per share, an 8% cumulative compound stock dividend provision, control over First Surety's issuance of additional shares of stock, an option to purchase up to 250,000 additional shares of preferred stock for $1.50 per share, and a liquidating preference, all being acceded to by First Surety's then majority directors. Furthermore, it was agreed that each share of preferred stock would have the right to one vote per share, the same right held by the holders of common stock despite the fact that on October 10, 1971 the bid and asked prices for common stock of First Surety were $4.375 and $4.75 respectively. Next, it was agreed that Mr. Drimmer would have the right to rescind the contem-

plated transaction if within two years from the date of his offer an action should be brought seeking to enjoin Mr. Drimmer from exercising any of his purported rights concerning the aforesaid 1,000,000 shares of First Surety preferred stock.

While Mr. Drimmer as well as his son Stephen testified at the trial of this case, a brief was not filed in support of the Drimmer position. In fact, on November 12, 1972, local counsel for the latter defendant, by letter addressed to the Court, adopted and placed reliance on the arguments contained in the post-trial brief filed by the other defendants. The fact that the defendant Drimmer did not file his tendered cross-claim prior to the trial of this case raises the question as to whether or not he should be permitted, in effect, to supplement the present record after failing to seek a timely amendment to his pleadings and introduce affirmative evidence on his alleged contractual rights when he had the opportunity. In short, Mr. Drimmer was content to permit counsel for the Fusselman directors to pull the laboring oar when his case was tried. He apparently now wishes to retry the case on his own terms.

The brief of the defendant directors, who have since resigned, contends that the evidence adduced at trial clearly fails to demonstrate a purpose on such defendants' part to " * * * perpetuate their control of and positions with First Surety * * " but rather establishes that the proposed sale of preferred stock to the defendant Drimmer was motivated by a worthy desire to protect the interests of the minority stockholders from the injury which would allegedly be suffered by them were control of First Surety to fall into the hands of Sharp and Cook. Such defendants thus argue that plaintiffs must either have demonstrated at trial that the director defendants, who are minor stockholders of First Surety, have, in resisting plaintiffs, acted in their own selfish interests in order to perpetuate themselves in their offices (with their emoluments), or, absent such proof, that the issuance of the aforesaid pre-

ferred stock to Mr. Drimmer would not be in the best interests of First Surety, Condec Corporation v. Lunkenheimer Co., 43 Del. Ch. 353, 230 A.2d 769, and Kors v. Carey, 39 Del.Ch. 47, 158 A.2d 136. Compare Bennett v. Propp, 41 Del.Ch. 14, 187 A.2d 405.

According to the argument made in the brief of the director defendants, plaintiffs have failed on both scores. However, inasmuch as the director defendants have resigned their offices and thus abandoned their former position that plaintiffs must be barred at all costs from taking over control of First Surety by acquiescing in the establishment of plaintiffs' control of such defendant, the attack on Mr. Cook's integrity and the claimed financial propriety of the Drimmer transaction would appear to be matters solely for Mr. Drimmer's claimed concern although it must, of course, again be noted that he is not a director of First Surety.

The questions to be answered are therefore whether or not after trial, at which he had a full opportunity to participate, defendant Drimmer may be given leave to file a proposed cross-claim for specific performance of an alleged contract of August 8, 1972 between him and First Surety and have his right to such form of relief preserved by the issuance of a preliminary injunction.

It is stated in 4 Pomeroy, Equity Jurisprudence, (Fifth Ed.), § 1402 concerning the remedy of specific performance:

"It is the settled rule in England and in the United States that contracts for public securities, government stocks, bonds, etc. will not be enforced, since they can always be bought in the market. But contracts for the sale of railway and other business corporation shares and bonds will be enforced in England. In the United States all such securities are ordinarily purchasable in the market, and the rule is settled by the weight of authority that contracts concerning stocks and bonds of corporations, like those con-

cerning government securities, will not be specifically enforced. Specific performance is, however, frequently decreed where the contract involves corporate stock of a peculiar or special value to complainant, or where the subject of the contract of unknown or not easily ascertainable value, or where other sufficient grounds are present for the interposition of equity."

It is also stated in 4 Pomeroy, Equity Jurisprudence, (Fifth Ed.), § 1405(a):

"The elements which peculiarly affect the equitable character of the agreement and of the remedy are the following: The contract must be perfectly fair, equal, and just in its terms and in its circumstances. If, then, the contract itself is unfair, one-sided, unjust, unconscionable, or affected by any other inequitable feature; or if its enforcement would be oppressive or hard on the defendant, or would prevent his enjoyment of his own rights, or would work any injustice; or if the plaintiff has obtained it by sharp and unscrupulous practices, by overreaching, by trickery, by taking undue advantage of his position, by non-disclosure of material facts, or by any other unconscientious means, then a specific performance will be refused. It necessarily follows that a less strong case is sufficient to defeat a suit for a specific performance than is requisite to obtain the remedy (see § 400). The remedy will therefore be refused when the performance of the contract would work a breach of trust, or work injury to third persons.

"The contract and the situation of the parties must be such that the remedy of specific performance will not be harsh or oppressive. This rule generally operates in favor of defendants; but may be invoked by a plaintiff when a defendant demands the remedy by counter-claim or cross-complaint. The oppression or hardship may result from unconscionable provisions of the contract itself; or it may result from the situation of the parties, unconnected with the terms of the contract or with the circumstances of its negotiation and execution; that is, from external facts or events or circumstances which control or affect the situation of the defendant."

On the basis of the facts of record and the above authorities I am satisfied that the remedy of specific performance is not available to the defendant Drimmer in this case because of the equitable maxim applicable to actions for specific performance, namely that he who seeks equity must come into court with clean hands, 2 Pomeroy's Equity Jurisprudence (Fifth Ed.) § 400. Here the defendant Drimmer seeks to enforce a bargain which he forced from a badgered board of directors urged on by the defendant Fusselman. Equity will not lend its aid to the specific performance of such a contract. See Gray Co. v. Alemite Corporation, 20 Del.Ch. 244, 174 A. 136, and Matthes v. Weir, 10 Del.Ch. 63, 84 A. 878.

Furthermore, it would appear to be necessary, under the terms of the March 2, 1972 resolution of the board of directors of First Surety relating to the proposed sale of 1,000,000 shares of Class A preferred stock of such corporation to Mr. Drimmer as well as under California law, to obtain the consent of the California Corporation Commissioner to a purchase such as the one Mr. Drimmer seeks to make. Where a condition precedent to a proposed transaction exists specific performance may not be granted, Fiedler, Inc. v. Coast Finance Co., 129 N.J.Eq. 161, 18 A.2d 268; Iavicoli v. DiMarco, 142 N.J.Eq. 699, 61 A.2d 247, and Popular Refreshments, Inc. v. Fuller's Milk Bar, 85 N.J.Super. 528, 205 A.2d 445, cases in which specific performance was denied because of the absence of necessary approval of a governmental agency over which defendant exercised no control.

Thus, having no chance of ultimate success on his claim to the right of specific

performance, the facts and circumstances surrounding such transaction having already been thoroughly explored and recorded in a trial in which Mr. Drimmer participated, the defendant Drimmer is not now entitled to a preliminary injunction (an anomalous application at this stage of the case), as now prayed for. A decision on the question of whether or not this Court has jurisdiction to consider Mr. Drimmer's claim for damages against First Surety arising out of an alleged breach of contract will be reserved for the present.

On notice, an order may be presented, dissolving the outstanding restraining order, denying the defendant Drimmer's application for a preliminary injunction as well as for leave to file a cross-claim for specific performance, but granting him leave to file such a pleading for damages.