**FEDERAL ELECTION COMMISSION, Plaintiff,**

v.

**NATIONAL RIGHT TO WORK COMMITTEE, INC., Defendant.**

**Civ. A. No. 90–0571.**

United States District Court, District of Columbia.

Feb. 15, 1996.

Robert William Bonham, III, Federal Election Commission, Washington, DC, for plaintiff.

Theodore B. Olson, Gibson, Dunn & Crutcher, Washington, DC, Frank Myers Northam, Webster, Chamberlain & Bean, Washington, DC, for defendant.

## MEMORANDUM AND ORDER

JACKSON, District Judge.

The Federal Election Commission ("FEC" or "Commission") brings this action to assess civil penalties, and for declaratory and injunctive relief, against the National Right to Work Committee, Inc. ("NRTWC") for its alleged violations of the Federal Election Campaign Act ("FECA" or the "Act"), 2 U.S.C. §§ 431 *et seq.*, arising, ironically, from the NRTWC's own efforts to expose violations of FECA by its political adversaries. The case is presently before the Court on cross-motions for summary judgment on multiple grounds, including the NRTWC's

affirmative defense of limitations.[1] For the reasons given, plaintiff's motion for summary judgment will be denied, and the defendant's cross-motion for summary judgment granted on the ground that this action is time-barred in its entirety. The complaint will therefore be dismissed with prejudice.

## I.

Plaintiff Federal Election Commission is an independent federal agency with exclusive jurisdiction for the administration and civil enforcement of FECA. *See generally* 2 U.S.C. §§ 437c(b)(1), 437d(a), and 437g. In pertinent part, the Act places restrictions on contributions to candidates for office in federal elections and requires that candidates observe detailed recordkeeping and reporting requirements for all contributions received. At issue in this case is FECA's prohibition of contributions or expenditures by corporations or labor organizations "in connection with" any federal election. 2 U.S.C. § 441b(a).

Defendant NRTWC is a nonprofit corporation that espouses the principle of "voluntary unionism," i.e. an employee's right to refuse to join or support a labor union, or, in other words, to work in an "open shop" workplace. Frequently embroiled in conflicts with organized labor, NRTWC asserts that it has an enduring interest in preventing unlawful conduct by labor unions, including their use of compulsory union dues for political purposes.

Beginning in 1983, the NRTWC suspected that several major labor unions, including the AFL–CIO and the National Education Association ("NEA"), intended to use union financial resources to support the primary campaigns of their preferred candidates. In February, 1984, the NRTWC devised a plan to investigate political spending by organized labor in the 1984 federal elections by planting undercover private detectives within organized labor's political apparatus throughout the United States, focusing primarily on AFL–CIO and NEA spending in support of the Mondale presidential campaign.

During the next four months, the NRTWC spent approximately $100,000 to hire detectives from several private agencies who posed as "volunteer" campaign workers and infiltrated the Mondale for President Committee and various labor organizations in several states. As instructed, the detectives observed possible violations of the FECA and gathered evidence for NRTWC's use in filing administrative complaints with the FEC. But, while conducting their covert investigation, the detectives participated in the usual "volunteer" activities, such as distributing literature and making phone calls to solicit and encourage support for Walter Mondale.[2]

In ironic turnabout, in October of 1984, the NEA filed its own administrative complaint with the FEC against the NRTWC alleging violations of the same political contributions laws that NRTWC's investigations had sought to expose on its part. The NEA's complaint contended that the "volunteer" services rendered by NRTWC's detectives for the Mondale campaign while in their undercover roles constituted illegal contributions or expenditures "in connection with" a federal election in violation of § 441b of the Act. The FEC reviewed the complaint and the NRTWC's response, and on January 8, 1985, a quorum of Commissioners concluded that there was "reason to believe" that the NRTWC had, indeed, violated the Act. A formal investigation ensued.

Not until May 23, 1989, however, did the Commission make a "probable cause" finding that the detectives' "volunteer" work per-

---

1. Proceedings in this case were stayed pending final disposition by the Supreme Court of the FEC's appeal of a D.C. Circuit decision holding the original composition of the FEC to be unconstitutional. *See FEC v. NRA Political Victory Fund,* 6 F.3d 821 (D.C.Cir.1993), *cert. dismissed,* 115 S.Ct. 537 (1994).

The parties have since submitted supplemental authority regarding the impact of *FEC v. NRA Political Victory Fund* on this litigation, an issue the Court finds it unnecessary to reach.

2. The NRTWC ultimately publicized its investigative findings, and also used the information to file numerous administrative complaints with the FEC, one of which eventuated in a penalty assessment against the Mondale for President Committee for accepting excessive campaign contributions from union PACs. *See In the Matter of Mondale, et al.,* MUR 1704 (FEC, November 1984).

formed while conducting their political espionage was unlawful. Then, in due course and in accordance with the statute, the usual informal "conferences, conciliation, and persuasion" followed.[3] No accommodation having been reached, the FEC formally voted to authorize the initiation of this lawsuit on December 12, 1989. The action, eventually filed on March 13, 1990, thus commenced nearly six years after, and three national elections removed from, the conduct giving rise to it. The complaint prays for the imposition of civil penalties, a declaration that NRTWC's actions were in violation of 2 U.S.C. § 441b(a), and a permanent injunction commanding the NRTWC to refrain from similar vigilantism in the future.

## II.

FECA does not contain an integral statute of limitations for civil actions, from which circumstance the FEC contends that Congress intended that it be without any statutory time constraints in matters of civil enforcement. In providing for "conference, conciliation, and persuasion" as informal administrative prerequisites to litigation, the Commission says, FECA is analogous to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, comparable provisions of which were held to exempt the EEOC from compliance with a one-year state statute of limitation in *Occidental Life Ins. Co. v. EEOC*, 432 U.S. 355, 97 S.Ct. 2447, 53 L.Ed.2d 402 (1977). Time limitations are not conducive to successful diplomacy, so the argument goes.

■ That reasoning has previously been rejected, however, by another judge of this district court in *FEC v. National Republican Senatorial Committee* ("NRSC"), 877 F.Supp. 15 (D.D.C.1995) (Pratt, J.), with whom this Court agrees. The U.S.Code elsewhere contains a five-year omnibus federal statute of limitations expressly applicable to all governmental actions for the assessment of "civil penalties," as the FEC seeks here. *See* 28 U.S.C. § 2462. Five years should be ample time for consensual resolutions of grievances to be reached if they are achievable at all.

■ Under § 2462, the time within which an action for enforcement must be commenced is measured from "the date when the claim first accrued." If it is to be held accountable in accordance with § 2462 for timely filings of actions it brings under FECA, the Commission argues, then its "claim" against NRTWC should be deemed to have "first accrued" when the Commission at long last made its "probable cause" finding. But adverting once again to *FEC v. NRSC, supra,* the only other reported case called to the Court's attention to have applied § 2462 to an enforcement action under FECA, the Court observes that Judge Pratt also held the period of limitations to have commenced to run when the alleged offense was committed, 877 F.Supp. at 18, as authority for which proposition he cited the case of *3M Co. v. Browner,* 17 F.3d 1453 (D.C.Cir. 1994).[4]

In *3M Co.*, without employing qualifying language to suggest that the time of "first accrual" might vary depending upon the statute involved, the D.C. Circuit held that § 2462 requires that "an action, suit or proceeding [for a civil penalty] must be commenced within five years of the date of the violation giving rise to the penalty." *Id.* at 1462. As Judge Pratt stated in *FEC v. NRSC,* "[t]he fundamental premise underlying the *3M Co.* decision is that it is inappropriate for a government regulator to wield the threat of an open-ended penalty. This is particularly true in cases where the ongoing threat of penalties may disrupt core First

---

**3.** Section 437g of the Act provides that once the Commission finds probable cause to believe that a violation has occurred, "the Commission shall attempt, for a period of at least 30 days, to correct or prevent such violation by informal methods of conference, conciliation, and persuasion, and to enter into a conciliation agreement with any person involved." 2 U.S.C. § 437g(a)(4). If the informal methods are unavailing, the Commission is authorized to institute a civil action for relief. 2 U.S.C. §§ 437g(a)(6)(A) and (B).

**4.** Proceedings by Environmental Protection Agency to impose civil penalties under Toxic Substances Control Act, 15 U.S.C. §§ 2601–2629, barred by § 2462 as untimely.

Amendment political activities." *FEC v. NRSC,* 877 F.Supp. at 18.

This Court once again agrees with Judge Pratt. The duration of the administrative efforts to bring about a consensual disposition of a FECA controversy are, as a practical matter, entirely within the control of the Commission. It can terminate an investigation at any time or prolong it indefinitely, and the Commissioners may vote to take a case to court whenever they wish. If, as the FEC argues, a claim were not to "accrue" until the FEC formally and officially chose to act upon it at any stage, then a respondent could theoretically remain exposed to punishment in perpetuity—a Damoclean dilemma of alarming proportions for a politically active organization such as NRTWC.[5]

■ Thus, deprived of its preference for an "accrual" date for its claim against NRTWC, the FEC then asks that at least it be given credit for any delay at the investigative stage of the proceedings occasioned by the NRTWC's determined (and protracted) resistance to the FEC's administrative subpoena.[6] The doctrine of equitable estoppel, it says, should bar NRTWC from asserting a statute of limitations defense, or, at a minimum, the statute should be deemed to have been tolled for the duration of the NRTWC's recalcitrance.

The short answer is that there is nothing "inequitable"—certainly none sufficient to work an estoppel—about NRTWC's insistence upon its right to due process in protecting itself from a subpoena it believed to be constitutionally invalid, and due process, as the FEC surely knows, often takes time. Moreover, any suggestion that the FEC might have sustained prejudice by reason of the delay loses all sympathetic force in light of the fact that when the NRTWC ultimately did comply with the subpoena, it did so in November of 1986, nearly three years before the period of limitations was due to expire. Finally, there is no evidence in this record that NRTWC ever sought to dissuade the FEC from a timely filing of this suit, or gave it reason to believe that NRTWC would waive its right to insist that the FEC resort to adjudication within the period of limitations if efforts at conciliation were unavailing.

■ To recapitulate, the FEC concedes that NRTWC's mercenary spies had ceased their operations by September of 1984. The NEA's administrative complaint to the FEC was made within the month following. The Commission did not get around to voting to find "probable cause" until May of 1989, a mere four months before the fifth anniversary of NRTWC's last known transgression, and even then it displayed no haste to file this suit. Not until March of 1990, nearly a year later, did it bring this case to court. Like Judge Pratt in *FEC v. NRSC,* this Court can "discern no reason why [the administrative] process cannot easily be accomplished by the [FEC] within the five year limitation in § 2462, even with discovery and subpoena enforcement delays of many months or even years." *FEC v. NRSC,* 877 F.Supp. at 18–19. The FEC's claim for civil penalties is barred by 28 U.S.C. § 2462.

### III.

■ The FEC argues that even if § 2462 bars its civil penalty claims, it is nevertheless entitled to its declaratory judgment and an injunction. The Court disagrees.

The Supreme Court has stated that when legal and equitable relief are available concurrently, "equity will withhold its relief ... where the applicable statute of limitations would bar the concurrent legal remedy." *Cope v. Anderson,* 331 U.S. 461, 464, 67 S.Ct.

---

5. The FECA's integral three-year limitations period for *criminal* actions, 2 U.S.C. § 455, has also been held to run from the date on which the violation occurred. *United States v. Hankin,* 607 F.2d 611, 615 (3d Cir.1979); *United States v. Wild,* 551 F.2d 418 (D.C.Cir.), *cert. denied,* 431 U.S. 916, 97 S.Ct. 2178, 53 L.Ed.2d 226 (1977).

6. The FEC issued the subpoena in July of 1985. NRTWC filed a motion to quash the subpoena with the FEC, which was denied on September 25, 1985. The FEC filed an enforcement proceeding on January 6, 1986. The district court ordered the NRTWC to comply with the subpoena on August 21, 1986, and denied NRTWC's motions to alter or amend the judgment and to stay execution of the judgment pending appeal in October of 1986. The NRTWC complied with the subpoena on November 3, 1986.

1340, 1341, 91 L.Ed. 1602 (1947).[7] Notions of welcome repose for ancient grievances aside, the practical concerns alone for problems of missing documents, faded memories, and absent witnesses that inevitably occur with the passage of time are no less problematic in adjudicating actions for declaratory and injunctive relief than in determining liability for monetary civil penalties.

■ Moreover, the FEC has failed to offer any evidentiary support for its professed apprehension that the NRTWC will ever conduct such clandestine surveillance of its opponents again. In *Wisconsin Gas Co. v. FERC*, 758 F.2d 669 (D.C.Cir.1985), the D.C. Circuit stated that

> Injunctive relief "will not be granted against something merely feared as liable to occur at some indefinite time," *Connecticut v. Massachusetts*, 282 U.S. 660, 674, 51 S.Ct. 286, 291, 75 L.Ed. 602 (1931); the party seeking injunctive relief must show that "[t]he injury complained of [is] of such *imminence* that there is a 'clear and present' need for equitable relief to prevent irreparable harm." *Ashland Oil, Inc. v. FTC*, 409 F.Supp. 297, 307 (D.D.C.), *aff'd*, 548 F.2d 977 (D.C.Cir.1976) (citations and internal quotations omitted).

*Id.* at 674. Aside from the FEC's somewhat wry observation that NRTWC "remains in the position, and has the motivations to engage in activities similar" to those it undertook in 1984, there is nothing in the record before the Court indicating that the NRTWC has in fact done so since, or that it has sinister designs for the future. In the circumstances, the Court concludes that injunctive relief is both unnecessary and unwarranted at this time.[8]

For the foregoing reasons, it is, this 15th day of February, 1996,

ORDERED, that plaintiff's motion for summary judgment is denied; and it is

FURTHER ORDERED, that defendant's motion for summary judgment is granted; and it is

FURTHER ORDERED, that the complaint is dismissed with prejudice.

---

**7.** *See also, Russell v. Todd*, 309 U.S. 280, 289, 60 S.Ct. 527, 532, 84 L.Ed. 754 (1940) ("equity will withhold its remedy if the legal right is barred by the local statute of limitations"); *Spannaus v. U.S. Dept. of Justice*, 824 F.2d 52, 55 (D.C.Cir. 1987) (general statute of limitations for civil suits against the United States, 28 U.S.C. § 2401(a), "applies to all civil actions whether legal, equitable or mixed").

**8.** *See also, FEC v. Furgatch*, 869 F.2d 1256, 1262 (9th Cir.1989), in which the Ninth Circuit observed with respect to awarding injunctive relief under the FECA:

> Because the Act implicates First Amendment concerns about political expression, it is important that courts avoid granting injunctive relief which is unnecessary to further the purposes of the Act.