**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

───────────

**No. 15-2285**

───────────

CATAWBA RIVERKEEPER FOUNDATION; CLEAN AIR CAROLINA,

        Plaintiffs – Appellees,

        v.

NORTH CAROLINA DEPARTMENT OF TRANSPORTATION; NICHOLAS J. TENNYSON, in his official capacity as Secretary of NCDOT,

        Defendants – Appellants,

        and

FEDERAL HIGHWAY ADMINISTRATION; JOHN F. SULLIVAN, in his official capacity as Division Administrator of FHWA,

        Defendants.

───────────

Appeal from the United States District Court for the Eastern District of North Carolina, at Raleigh.  James C. Dever III, Chief District Judge.  (5:15-cv-00029-D)

───────────

Argued: September 21, 2016      Decided: December 13, 2016

───────────

Before DUNCAN, KEENAN, and DIAZ, Circuit Judges.

───────────

Vacated and remanded with instructions by published opinion. Judge Diaz wrote the opinion, in which Judge Duncan and Judge Keenan joined.

───────────

**ARGUED:** Scott Thomas Slusser, NORTH CAROLINA DEPARTMENT OF JUSTICE, Raleigh, North Carolina, for Appellants.  Kimberley

Hunter, SOUTHERN ENVIRONMENTAL LAW CENTER, Chapel Hill, North Carolina, for Appellees. **ON BRIEF:** Roy Cooper, Attorney General, NORTH CAROLINA DEPARTMENT OF JUSTICE, Raleigh, North Carolina, for Appellants. Ramona H. McGee, SOUTHERN ENVIRONMENTAL LAW CENTER, Chapel Hill, North Carolina, for Appellees.

———————————

DIAZ, Circuit Judge:

This appeal involves the proposed construction of the Gaston East-West Connector,[1] a 22-mile toll road in North Carolina spanning from southeast Gaston County to west Mecklenburg County with new crossings over the South Fork and Catawba Rivers. The Catawba Riverkeeper Foundation and Clean Air Carolina (collectively, the "Conservation Groups") brought suit against the North Carolina Department of Transportation ("NCDOT"), the Federal Highway Administration, and officials representing those agencies, challenging the environmental analysis conducted for the Connector. The district court granted the Conservation Groups' motion for summary judgment.

Before the district court ruled, the North Carolina General Assembly stripped the Connector of its funding and repealed the statute that expressly authorized its construction. And after the district court entered judgment, state and local authorities removed the Connector from the various planning models for such projects. At oral argument, NCDOT represented that the Connector is no longer viable. In light of these developments, we conclude that this appeal is moot and accordingly vacate the district court's judgment.

---

[1] The Connector is known locally as the Garden Parkway.

Local planners in Gaston County, North Carolina first considered the need to construct a bypass to improve east-west mobility between Gaston County and Mecklenburg County in the late 1980s. NCDOT began studying the project in 2001, meeting with other agencies and local authorities to assess the benefits of the project relative to alternatives such as mass transit or improvements to existing roadways. In coordination with these officials, NCDOT determined that building a "new location freeway" more effectively addressed the goals of (1) "improv[ing] east-west transportation mobility . . . between Gastonia and the Charlotte metropolitan area" and (2) "establish[ing] direct access between the rapidly growing area of southeast Gaston County and west Mecklenburg County." J.A. 723.

As required by the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321, et seq., NCDOT and the Federal Highway Administration (collectively, the "Agencies") began assessing the environmental impact of the project.[2] In the

---

[2] This assessment, which includes time for public notice and comment, ultimately leads to the preparation of a Record of Decision. The Record of Decision "identifies the Selected Alternative, presents the basis for the decision, identifies all the alternatives considered, specifies the 'environmentally (Continued)

meantime, the North Carolina General Assembly designated the Connector a candidate project subject to the control of the North Carolina Turnpike Authority. N.C. Gen. Stat. § 136-89.183(a)(2)(b) (2006) (repealed by 2013 N.C. Sess. Laws § 5.1). The General Assembly also gave the Turnpike Authority conditional power to propose additional projects not expressly authorized in the statute, provided they were "approved by the General Assembly prior to construction" and "shown in the current State Transportation Improvement Plan." Id. § 136-89.183(a)(2) (2006).

In April 2009, the Agencies published for public review and comment a draft Environmental Impact Statement for the Connector. The draft statement considered twelve alternative "new location" controlled-access toll roads, ranging from 21.4 to 23.7 miles in length, assessed each alternative's capacity to meet the project's needs, and compared each with a "no-build" baseline alternative. The Agencies also forecasted traffic demand and distribution in the geographic area through 2030, creating both a "build" forecast depicting how a network of

---

preferable alternative,' and provides information on the adopted means to avoid, minimize, and compensate for environmental impacts." J.A. 1480.

transportation facilities would operate with projected future traffic volumes and a "no build" baseline forecast.

To develop the traffic forecasts, the Agencies relied on data derived from socioeconomic forecasts prepared by area planning organizations that assumed construction of the Connector. The Agencies superimposed each alternative onto this set of socioeconomic projections and eliminated alternatives from further study on this basis. The draft Environmental Impact Statement also contained a qualitative Indirect and Cumulative Effects ("ICE") report, describing the Connector's estimated effects on growth and land use, wildlife habitat, and water resources in the geographic area.

In response to requests from environmental advocates and other agencies, the Agencies also published a quantitative ICE report that analyzed future land-use change. They first created a "build" forecast and then employed a "gravity model" to reallocate the growth effects to create the "no build" forecast baseline.[3] The Agencies determined that construction of the Connector would result in 3,700 additional households and 300

---

[3] A gravity model produces quantified results that can serve as the basis for assessing land use change. The model "essentially holds that all other factors influencing development held constant, growth will shift towards areas with the greatest relative accessibility improvement as a result of the project." J.A. 2350.

6

fewer jobs in the study area when compared to the "no build" forecast.

The Agencies subsequently published a final Environmental Impact Statement, addressing public and other agency comments on the earlier draft statement and identifying the Connector as the preferred alternative. They estimated the Connector's cost to be about $943 million, to be paid for by toll revenue bonds, an annual $35 million appropriation of "gap" funding from the North Carolina General Assembly, and other funding sources. In February 2012, the Federal Highway Administration issued a Record of Decision, identifying the Connector as the "environmentally preferable alternative . . . because it represents the best overall balanced minimization of all impacts analyzed." J.A. 3747.

B.

The Conservation Groups participated in the NEPA process for the Connector, submitting comments and attending public meetings to voice their concerns about the integrity of the environmental analysis conducted by the Agencies. Following our decision in North Carolina Wildlife Federation v. North Carolina Department of Transportation, 677 F.3d 596 (4th Cir. 2012),[4] the

---

[4] That case concerned the proposed construction of the Monroe Connector Bypass by the Agencies. 677 F.3d at 598. We concluded that the Agencies violated NEPA by failing to disclose (Continued)

7

Groups urged the Federal Highway Administration to rescind the Connector's Record of Decision and prepare a supplemental Environmental Impact Statement. The Federal Highway Administration declined to do so.

The Conservation Groups thereafter filed suit in the Western District of North Carolina pursuant to the Administrative Procedure Act, 5 U.S.C. § 701 et seq. ("APA"), seeking: (1) a declaratory judgment that the Agencies violated NEPA by conducting a deficient environmental analysis, (2) vacatur of the Record of Decision, and (3) injunctive relief. After the parties filed cross-motions for summary judgment, the court transferred the case to the Eastern District of North Carolina.

While the motions were pending, the North Carolina General Assembly passed legislation requiring a data-driven prioritization process to score and rank proposed transportation projects based on a number of factors, including cost and

---

to the public that the Bypass's underlying NEPA analysis relied on socioeconomic data that assumed construction of the Bypass and by disseminating erroneous information about that assumption. Id. at 603. Although we did not decide whether NEPA permitted the Agencies to use data assuming the construction of the Bypass when creating a "no build" baseline, we noted that "courts not infrequently find NEPA violations when an agency miscalculates the 'no build' baseline or when the baseline assumes the existence of a proposed project." Id.

congestion. N.C. Gen. Stat. § 136-189.11. The Connector received a low score under this new funding formula, ranking below 1,200th place. The General Assembly subsequently repealed that portion of the statute giving the Turnpike Authority express power to build the Connector, 2013 N.C. Sess. Laws § 5.1, and rescinded the Connector's earmarked $35 million annual funding. 2013 N.C. Sess. Laws § 4.8 (striking funding for the "Garden Parkway," previously codified at N.C. Gen. Stat. § 136-176(b2)).

Given these developments, the district court directed the parties to brief whether the court retained subject matter jurisdiction and whether the Turnpike Authority still had the power to build the Connector. The parties urged the court to resolve the pending motions for summary judgment, arguing that the Turnpike Authority could still build the Connector as an unspecified project because it remained on the list of approved projects at both the state and local levels.

The court proceeded to the merits and granted the Conservation Groups' motion for summary judgment, holding that the alternatives analysis underlying the Connector "violated NEPA and the APA by using the same set of socioeconomic data that assumed construction of the [Connector] to assess the environmental impacts of the Build and No Build alternatives." J.A. 324. The district court also agreed with the Conservation

9

Groups that the Agencies failed to adequately assess and disclose the Connector's environmental impacts, reasoning that:

> [D]efendants' fundamental assumption that the [Connector] would have no effect on overall growth in the Metrolina region, unsupported by any evidence showing complete saturation of the region, and their use of the gravity model to reallocate assumed growth in the No Build condition constitute clear error and violates NEPA and the APA.

J.A. 325. The court consequently vacated the Record of Decision for the Connector.[5]

Following the district court's ruling, the last domino fell for the Connector when it was removed from local and state transportation plans,[6] which in turn meant that it was no longer eligible for federal funding. In short, the Connector no longer has the statutory authority or funding to proceed.

## II.

NCDOT appeals the merits of the district court's decision. But preliminarily, it also contends that the case is now moot, and therefore seeks vacatur of the district court's order granting summary judgment to the Conservation Groups. Because we agree with NCDOT that developments subsequent to the district

---

[5] The Court declined to grant injunctive relief, finding it unnecessary given its ruling.

[6] The project remains on a 2040 horizon year plan prepared by local authorities, but it now takes the form of a 3.4-mile long bridge crossing facility.

10

court's ruling render the appeal moot, we do not address the merits of the district court's ruling.

Article III limits the jurisdiction of federal courts to cases and controversies. U.S. Const. art. III, § 2, cl.1. "The doctrine of mootness originates in Article III's 'case' or 'controversy' language." Incumaa v. Ozmint, 507 F.3d 281, 286 (4th Cir. 2007) (quoting DaimlerChrysler Corp. v. Cuno, 547 U.S. 332, 352 (2006)) (internal quotation marks omitted). Thus, "[t]o remain a justiciable controversy, a suit must remain alive throughout the course of litigation, to the moment of final appellate disposition." Bahnmiller v. Derwinski, 923 F.2d 1085, 1088 (4th Cir. 1991) (internal quotation marks omitted).

"[E]ven if a plaintiff has standing when he or she files a complaint, subsequent events can moot the claim." Pashby v. Delia, 709 F.3d 307, 316 (4th Cir. 2013). "A case becomes moot, and thus deprives federal courts of subject matter jurisdiction, when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." Id. (internal quotation marks omitted). In other words, a case is moot when "our resolution of an issue could not possibly have any practical effect on the outcome of the matter." Norfolk S. Ry. Co. v. City of Alexandria, 608 F.3d 150, 161 (4th Cir. 2010).

11

NCDOT contends that this case became moot when local and state planners removed the Connector project from their respective transportation improvement plans, rendering the Connector "no longer eligible for federal funding or construction regardless of the merits of the NEPA issue on appeal." Appellants' Br. at 32–33. At oral argument, counsel for NCDOT represented that "the [Record of Decision] is really a nullity," and further that "[t]his Project is defunct. It's no longer moving forward." See also Appellants' Br. at 26 ("The Project . . . is no longer viable").

In turn, although the Conservation Groups concede that the Connector now lacks funding, they say that the case still presents a live controversy because the Record of Decision that approved the project has not been rescinded and could thus "be used to allow construction of the Connector at a later date." Appellees' Br. at 24. As they see it, little more than shifting political priorities and funding hinder NCDOT from using the Record of Decision to build the Connector on the basis of an allegedly flawed NEPA analysis. We do not agree.

As things now stand, the Connector faces multiple barriers to construction. To be built, it must overcome the poor ranking it received under the new funding formula enacted by the General Assembly, local and state planners must reincorporate the Connector into the various local and state transportation

12

improvement plans, and the state legislature must reallocate about $900 million to the project. Moreover, even if these events come to pass, clearing the Connector's path to construction, we are not persuaded by the Groups' assertion that NEPA's implementing regulations allow the Agencies to conduct only a "superficial" and cursory reevaluation of the Connector's Record of Decision. See 23 C.F.R. § 771.129(b) (requiring a written evaluation of the final Environmental Impact Statement if "major steps to advance the action . . . have not occurred within three years after the approval of the final EIS"). Instead, the regulatory regime under which the Agencies operate renders the likelihood that NCDOT would proceed immediately to construct the Connector pursuant to a now four-year-old Record of Decision exceedingly remote.

Under these circumstances, we decline the Conservation Groups' request to issue "an opinion advising what the law would be upon a hypothetical state of facts." Preiser v. Newkirk, 422 U.S. 395, 401 (1975) (quoting North Carolina v. Rice, 404 U.S. 244, 246 (1971)). "[W]e may only decide cases that matter in the real world," and as such, can offer no relief to the Conservation Groups because the Connector and its underlying NEPA analysis, deficient or not, pose only hypothetical and speculative harm. Norfolk, 608 F.3d at 161 (internal quotation marks omitted); see also Preiser, 422 U.S. at 402 (a request for

13

declaratory relief survives a mootness challenge where the facts "show that there is a substantial controversy, between parties having adverse legal interests, *of sufficient immediacy and reality to warrant the issuance of a declaratory judgment*") (internal quotation marks omitted); Connecticut v. Massachusetts, 282 U.S. 660, 674 (1931) (An injunction "will not be granted against something merely feared as liable to occur at some indefinite time in the future.").

In sum, given the remote possibility that the Connector could proceed pursuant to the allegedly deficient Record of Decision, and given NCDOT's representations on appeal that the Connector is no longer viable, we cannot agree with the Conservation Groups that "[r]evival of the Connector is a real possibility." Appellants' Br. at 28. This case is moot.

III.

We turn now to whether we should vacate the district court's judgment. The Conservation Groups contend that even if the case is moot, vacatur is improper because the circumstances that deprive us of subject matter jurisdiction are not the product of "happenstance," but rather the direct result of NCDOT's lobbying and decisions. In other words, the Groups argue that NCDOT contributed to the Connector's demise, mooting this case. But as we explain, we do not think it proper to

14

impute the actions of state legislators and local planners to NCDOT. Accordingly, we shall vacate the district court's judgment.

A.

Our "customary practice when a case is rendered moot on appeal is to vacate the moot aspects of the lower court's judgment." Norfolk, 608 F.3d at 161. In such circumstances, the equitable remedy of vacatur "'clears the path for future relitigation of the issues between the parties.'" Alvarez v. Smith, 558 U.S. 87, 94 (2009) (quoting United States v. Munsingwear, 340 U.S. 36, 40 (1950)).

The Supreme Court, however, has recognized exceptions to this general practice in instances where mootness occurs through the voluntary action of the losing party, rather than through happenstance. See U.S. Bancorp Mortg. Co. v. Bonner Mall P'ship, 513 U.S. 18, 29 (1994) ("[M]ootness by reason of settlement does not justify vacatur of a judgment under review."); Karcher v. May, 484 U.S. 72, 82–83 (1987) (vacatur inappropriate when losing party fails to pursue its appeal). Consistent with that precedent, we too have said that "'vacatur normally is not appropriate . . . when the losing party's deliberate actions have rendered moot an otherwise live controversy.'" United States v. Springer, 715 F.3d 535, 541 (4th Cir. 2013) (quoting Remus Joint Venture v. McAnally, 116

15

F.3d 180, 185 (6th Cir. 1997)). "The rationale for this rule is that appellants should not be allowed to escape the preclusive effect of an adverse district court judgment simply by taking a unilateral action during the pendency of their appeal to moot the matter." Id. at 542.

However, where "appellate review of the adverse ruling was prevented by 'the vagaries of circumstance,'" vacatur remains available, "subject . . . to considerations of the public interest." Valero Terrestrial Corp. v. Paige, 211 F.3d 112, 117–18 (4th Cir. 2000) (quoting Bancorp, 513 U.S. at 25)). Thus, when determining the propriety of vacatur in a moot appeal, our decision is "informed almost entirely, if not entirely, by the twin considerations of fault and public interest." Id. at 118.

### B.

The Conservation Groups contend that vacatur is inappropriate because NCDOT "contributed to the mootness of which they now complain," by lobbying the General Assembly for the enactment of the new transportation funding statute and formally approving the Connector's removal from the state's transportation improvement program. Appellees' Br. at 30. We do not agree.

We dispel first the Groups' assertion that NCDOT's support of transportation funding reform—characterized by the Groups as

16

an "intentional intercession in the legislative process"—is sufficient to impute the actions of the General Assembly to NCDOT. Id. To the contrary, our precedent counsels against conflating the actions of a state executive entity with those of a state legislature. Valero, 211 F.3d at 115.

In Valero, the appellant corporation brought suit against various West Virginia executive agencies, challenging the constitutionality of certain provisions of the West Virginia Code pertaining to waste disposal and management regulation. Id. The district court declared the provisions constitutionally invalid and issued a permanent injunction prohibiting their enforcement. Id. Shortly after judgment was entered, the West Virginia Legislature revised the enjoined provisions, mooting the case and prompting the executive agencies to seek vacatur of the adverse decision. Id.

On appeal, we affirmed the district court's vacatur of its decision, distinguishing explicitly between the actions of the state legislature in amending the statutory provisions at issue, thereby mooting the case, from the actions of the defendant state executive officials, holding that "defendant state executive officials are in a position akin to a party who finds its case mooted by 'happenstance,' rather than events within its control." Id. at 121 (internal quotation marks omitted). As a

17

result, we concluded that the principal consideration of "fault" counseled in favor of vacatur. Id.[7]

Similarly, here, NCDOT, a state executive agency, is a separate entity from the North Carolina General Assembly. That NCDOT lobbied the General Assembly in support of the transportation funding reform does not alter this central distinction, nor does it warrant the conclusion that NCDOT "caused" the Connector's demise. See Chem. Producers & Distribs. Ass'n v. Helliker, 463 F.3d 871, 879 (9th Cir. 2006) ("Lobbying Congress or a state legislature cannot be viewed as 'causing' subsequent legislation for purposes of the vacatur inquiry. Attributing the actions of a legislature to third parties rather than to the legislature itself is of dubious legitimacy . . . .").

In sum, to the extent that the enactment of transportation funding reform helped to render this case moot, we view it as

---

[7] Our sister circuits have also distinguished the actions of an executive entity from those of the legislature for purposes of the "voluntary action" presumption against vacatur. See, e.g., Khodara Envtl., Inc. v. Beckman, 237 F.3d 186, 195 (3d Cir. 2001) (vacating a lower court's judgment as mooted by legislative amendment and rejecting the appellee's assertion that the appellant Federal Aviation Association "misuse[d] . . . the legislative process" to encourage Congress to amend the challenged statute "to frustrate an unfavorable judgment"); Nat'l Black Police Ass'n v. District of Columbia, 108 F.3d 346, 353 (D.C. Cir. 1997) (presumption against vacatur "is usually inapplicable when legislative action moots a case and the government seeks vacatur").

the consequence of actions of the North Carolina General Assembly, not NCDOT. See Rio Grande Silvery Minnow v. Bureau of Reclamation, 601 F.3d 1096, 1131 (10th Cir. 2010) ("[T]he acts of the legislature are not the acts of executive branch agencies, states, or private parties.").

We turn next to the Groups' assertion that vacatur is inappropriate because NCDOT intentionally mooted the case when it approved the removal of the Connector from the state's transportation improvement program. Two points readily dispense with this argument: (1) planners at the local level retain discretion over which projects to include in their transportation improvement plans, 23 C.F.R. § 450.326(a), and (2) federal regulations require that an approved local transportation plan be included in the state's transportation improvement program without change. See 23 C.F.R. § 450.218(b). As such, although NCDOT approved the Connector's removal from its statewide plan, that result was a fait accompli following the local planning agency's decision to remove the Connector from its transportation plan. Put simply, NCDOT did not act voluntarily to moot this case.

## C.

Finally, we consider the public interest. We have recognized that "there is a substantial public interest in judicial judgments." Valero, 211 F.3d at 118. This is because

19

"[j]udicial precedents are presumptively correct and valuable to the legal community as a whole." Id. (quoting Bancorp, 513 U.S. at 26). In Bancorp, the Supreme Court's concern for the public interest led the Court to withhold the remedy of appellate vacatur from the losing party who had mooted the case through settlement, thereby "voluntarily forfeit[ing] his legal remedy by the ordinary processes of appeal or certiorari." 513 U.S. at 25. The Court reasoned that employing the remedy of vacatur in that instance constituted "a refined form of collateral attack on the judgment" that would "disturb the orderly operation of the federal judicial system," and therefore did not serve the public interest. Id. at 27.

This concern, however, did not prevent the Court in Bancorp from "stand[ing] by" the proposition that "mootness by happenstance provides sufficient reason to vacate." Id. at 23, 25 n.3 (citing Munsingwear, 340 U.S. at 40–41). We see no reason to depart from that general principle here. Because events beyond the parties' control have mooted this appeal, leaving the district court's decision undisturbed would not serve the public interest.

IV.

For the reasons given, we vacate the district court's judgment and remand the case with instructions that the district

20

court dismiss the action.  See Mellen v. Bunting, 327 F.3d 355, 364 (4th Cir. 2003) ("If a claim becomes moot after the entry of a district court's final judgment and prior to the completion of appellate review, we generally vacate the judgment and remand for dismissal.").

VACATED AND REMANDED
WITH INSTRUCTIONS
